| | |
|---|---|
| 1 | DENNIS J. HERRERA, State Bar #139669 |
|   | City Attorney |
| 2 | JESSE C. SMITH, State Bar #122517 |
|   | Chief Assistant City Attorney |
| 3 | RONALD P. FLYNN, State Bar #184186 |
|   | Chief Deputy City Attorney |
| 4 | YVONNE R. MERÉ, State Bar #173594 |
|   | Chief of Complex and Affirmative Litigation |
| 5 | MOLLIE M. LEE, State Bar #251404 |
|   | SARA J. EISENBERG, State Bar #269303 |
| 6 | Deputy City Attorneys |
|   | City Hall, Room 234 |
| 7 | 1 Dr. Carlton B. Goodlett Place |
|   | San Francisco, California 94102-4602 |
| 8 | Telephone:    (415) 554-4748 |
|   | Facsimile:    (415) 554-4715 |
| 9 | E-Mail:        brittany.feitelberg@sfcityatty.org |

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, | Case No. |
| Plaintiff, | **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |
| vs. | |
| JEFFERSON B. SESSIONS III, Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE, DOES 1-100, | |
| Defendants. | |

Complaint;
CCSF v. Jefferson B. Sessions III, et al; Case No.

N:\AFFIRM\LI2018\181193\01266072.docx

# INTRODUCTION

1. This lawsuit challenges Defendants' bulk rescission of a wide swath of Department of Justice ("DOJ" or "Department") guidance documents setting forth DOJ's interpretation of laws that protect immigrants, the poor, people of color, and people with disabilities. The documents—which provided guidance to regulated entities and helped to protect the civil rights of marginalized individuals across the country—were withdrawn without any meaningful explanation, as required by the Administrative Procedure Act ("APA"). Such an unexplained bulk repeal was unprecedented prior to this administration. The rescission was arbitrary and capricious, and should be vacated.

2. The stated mission of DOJ is "to ensure fair and impartial administration of justice for all Americans." Yet, over the past year and a half, the Department—under the leadership of Attorney General Jefferson B. Sessions—has shown a shocking disregard for protecting the rights of vulnerable communities, rolling back civil rights initiatives in a wide variety of areas. Barely a month into the Trump administration, for example, the Department dropped the federal government's longstanding position that a Texas voter ID law under legal challenge was intentionally racially discriminatory. Shortly thereafter, DOJ attempted—unsuccessfully—to block a court from approving a consent decree negotiated by the Department following an extensive multi-year investigation that aimed to reform discriminatory police practices in the Baltimore Police Department. The DOJ also effectively shut down the Office for Access to Justice ("ATJ"), which was dedicated to improving legal resources for indigent litigants in civil, criminal, and tribal courts. ATJ's offices now sit dark in the Justice Department building.

3. And, in December 2017, Attorney General Sessions rescinded twenty-five DOJ guidance documents—most of which were aimed at protecting marginalized communities.

4. In a press release announcing the repeal, Attorney General Sessions declared—in broad conclusory terms—that the documents were being withdrawn because they were "unnecessary, inconsistent with existing law, or otherwise improper." *See* Press Release No. 17-1469, DOJ Office of Public Affairs, *Attorney General Jeff Sessions Rescinds 25 Guidance Documents* (Dec. 21, 2017) (attached hereto as Exhibit A). He also stated generally that "any guidance that is outdated, used to circumvent the regulatory process, or that improperly goes beyond what is provided for in statutes or

regulation should not be given effect." *Id.* He did not explain which rationale allegedly applied to which document or offer any other particularized justification.

5. Elsewhere, components of DOJ have offered additional explanation for the repeal of some of the guidance documents. For example, the Civil Rights Division explains on its website that the guidance on bailing-out procedures under Section 4(b) and Section 5 of the Voting Rights Act was withdrawn because the "Supreme Court's decision in Shelby County v. Holder, 570 U.S. ___ (2013) held that the coverage formula set forth in Section 4(b) of the Act was unconstitutional, and as a consequence, no jurisdictions are now subject to the coverage formula in Section 4(b) or to Sections 4(f)(4) and 5 of Act. Accordingly, guidance regarding bailout under Section 4(a) is no longer necessary." *See Section 4 of the Voting Rights Act*, DOJ Civil Rights Division, https://www.justice.gov/crt/section-4-voting-rights-act (last updated Dec. 21, 2017).

6. But slipped into the mix of the twenty-five repealed documents were six significant civil rights documents that Defendants provided no meaningful explanation for withdrawing. All six provided critical guidance to state and local governments about compliance with federal laws. Among them were procedures to help state and local governments eliminate unlawful fees against juvenile offenders, standards outlining discrimination protections for disabled individuals in government employment service systems, and guidance for employers about compliance with the anti-discrimination provisions of the Immigration and Nationality Act.

7. The rescission of these documents has been decried by disability rights groups and civil rights activists.[1] Indeed, the United States Commission on Civil Rights—an independent, bipartisan federal agency charged with advising the President and Congress on civil rights matters—issued a statement "strongly criticiz[ing]" the withdrawal of the "recent, narrowly crafted, urgently applicable

---

[1] *See, e.g.*, *Lawyers' Committee for Civil Rights Under Law Condemns DOJ's Decision to Revoke Critical Legal Guidance Documents*, Lawyers' Committee for Civil Rights (Dec. 22, 2017), https://www.commondreams.org/newswire/2017/12/22/lawyers-committee-civil-rights-under-law-condemns-dojs-decision-revoke-critical ("We condemn Attorney General Sessions's latest attempt to turn back the clock on civil rights progress . . . ."); *DOJ Withdraws Olmstead Employment Guidance*, Letter to DOJ in Response to Olmstead Guidance Withdrawal from Over 200 Disability Organizations, Center for Public Representation (Jan. 5, 2018), https://centerforpublicrep.org/initiative/doj-withdraws-olmstead-employment-guidance/.

guidance documents." *U.S. Commission on Civil Rights Strongly Criticizes Attorney General Jeff Sessions' Withdrawal of Critical Civil Rights Guidance*, U.S. Commission on Civil Rights (Jan. 19, 2018), http://usccr.gov/press/2018/01-19-PR-Sessions.pdf. The Commission "call[ed] for Attorney General Sessions immediately to correct the civil rights harm his guidance withdrawal works on our nation's social fabric by reinstating the guidance, signaling the necessary ongoing leadership of the nation's Department of Justice in actually securing justice for the people." *Id.*

8. Defendants' failure to provide any meaningful explanation for the repeal of these documents is galling—and unlawful. The APA requires agencies to disclose the basis of their decisions, including policy changes made through repeals. They must demonstrate that they engaged in reasoned decision-making. And the explanation for their decision cannot be conclusory; it must be clear enough that the agency's "path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

9. The APA imposes these requirements for an important reason. A fundamental tenet of our administrative system is that agency decision-making should not happen in the shadows. The APA's procedural requirements exist to allow members of the public—and the courts—to understand and evaluate the legitimacy and consequences of the agency's action. In the absence of such an explanation, the public is left to guess whether Defendants believe the repealed documents are outdated—and, if so, whether a different document controls—or improperly imposed binding obligations that should have been issued through notice-and-comment rulemaking. Regulated entities like San Francisco and the individuals impacted by the rescission of the documents cannot evaluate the validity of the repeal, challenge it if necessary, or tailor their conduct appropriately when agency action is opaque.

10. The public is entitled to—and the APA demands—more from our federal government.

**JURISDICTION AND VENUE**

11. The Court has jurisdiction under 28 U.S.C. Sections 1331 and 1346. This Court has further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 *et seq*. There exists an actual and justiciable controversy between Plaintiff and Defendants requiring resolution by this Court. Plaintiff has no adequate remedy at law.

12. Venue properly lies within the Northern District of California because this is a civil action in which Defendants are an agency, or officers of an agency, of the United States, because a substantial part of the events or omissions giving rise to this action occurred in the District, and, further, because Plaintiff resides in this District and no real property is involved in the action. 28 U.S.C. § 1391(e).

**INTRADISTRICT ASSIGNMENT**

13. Pursuant to Civil Local Rule 3-2(c), this case should be assigned to the San Francisco Division or the Oakland Division of this Court because the action arises in San Francisco County.

**PARTIES**

14. Plaintiff City and County of San Francisco is a municipal corporation organized and existing under and by virtue of the laws of the State of California, and is a charter city and county.

15. Defendant Jefferson B. Sessions is the Attorney General of the United States. He is sued in his official capacity. The Attorney General is the federal official leading the DOJ, which is responsible for the governmental actions at issue in this lawsuit.

16. Defendant DOJ is an executive department of the United States of America and an agency within the meaning of 5 U.S.C. § 551(1). DOJ has responsibility for, among other things, administering and enforcing the Civil Rights Acts of 1957, 1960, 1964, and 1968, as amended; the Voting Rights Act of 1965, as amended; the Fair Housing Act of 1968; and the Fair Housing Amendments Act of 1988. In addition, DOJ is charged with all departmental responsibilities under the Americans with Disabilities Act of 1990.

17. Doe 1 through Doe 100 are sued under fictitious names. Plaintiff San Francisco does not now know the true names or capacities of said Defendants, who were responsible for the alleged violations, but pray that the same may be alleged in this complaint when ascertained.

**FACTUAL ALLEGATIONS**

18. In February 2017, President Trump issued Executive Order 13777, "Enforcing the Regulatory Reform Agenda," in which he ordered each executive agency to create a "Regulatory Reform Task Force" to identify regulatory actions for elimination. Exec. Order No. 13,777, 82 Fed. Reg. 12,285 (Feb. 24, 2017).

19. DOJ established the required task force and installed former Associate Attorney General Rachel Brand as the chair[2]—but has refused to provide information to the public about other task force members.[3]

20. On June 28, 2017, the DOJ Task Force published a Request for Public Comment in the Federal Register seeking input on regulatory actions that should be considered for repeal, replacement, or modification. Enforcing the Regulatory Reform Agenda; Department of Justice Task Force on Regulatory Reform Under E.O. 13777, 82 Fed. Reg. 29,248 (proposed June 28, 2017). This cursory notice requested public comment in broad terms without reference to any specific regulation or document.

21. Among the comments submitted was a request by the Leadership Conference on Civil and Human Rights for DOJ to identify individual regulations and policies it was considering for repeal. Letter from Kristine Lucius, Executive Vice President, the Leadership Conference on Civil and Human Rights, to Robert Hinchman, Senior Counsel of the Office of Legal Policy, DOJ (Aug. 14, 2017), https://www.regulations.gov/document?D=DOJ-OLP-2017-0007-0013. The Leadership Conference explained that in order to provide meaningful comments, it "would need the Department to give proper notice of which specific regulations or policies it is considering repealing, replacing, or modifying." *Id.*

22. Other agencies did this—publishing notice in the Federal Register of the specific rules and regulations considered for repeal or modification. For example, the U.S. Patent and Trademark

---

[2] Rachel Brand left DOJ in February 2018. DOJ has not disclosed who—if anyone—replaced her as chair of the task force.

[3] *See* Robert Faturechi, *Secrecy and Suspicion Surround Trump's Deregulation Teams*, ProPublica (Aug. 7, 2017), https://www.propublica.org/article/secrecy-and-suspicion-surround-trumps-deregulation-teams ("In an email exchange, a spokesman, Ian Prior, said he could not provide additional names because 'the Task Force is made up of components, not particular employees.' 'A component may have multiple employees assisting with the work,' he added. Asked if he could name any of those employees, he responded, 'Decline.'").

Indeed, ignoring multiple requests by members of Congress to disclose Regulatory Reform Task Force members leading regulatory rollback efforts, DOJ and other agencies "are actively hiding their members and their meetings from public view." Letter from Rep. Elijah Cummings et al. to Mick Mulvaney & Neomi Rao (Aug. 7, 2017). As a result, senior members of the House of Representatives Committee of Oversight and Government Reform have requested subpoenas to compel DOJ to provide the names of their task force members. *See* Letter from Rep. Elijah E. Cummings to Rep. Trey Gowdy (Mar. 13, 2018).

Office published a proposal to remove regulations governing reservation clauses, petitions from a primary examiner's refusal to admit an amendment, and other specific rules pursuant to Executive Order 13777.  *See* Changes To Eliminate Unnecessary Regulations, 83 Fed. Reg. 2759-60 (proposed Jan. 19, 2018).[4]  DOJ, however, provided no further information on the specific documents being considered for repeal.

23. Instead, on November 17, 2017, Attorney General Sessions stated at the Federalist Society 2017 National Lawyers Convention that "[w]e have prohibited all Department of Justice components from issuing any guidance that purports to impose new obligations on any party outside the Executive Branch.  We will review and repeal existing guidance documents that violate this common sense principle."  *See Attorney General Sessions Delivers Remarks at the Federalist Society 2017 National Lawyers Convention*, DOJ Office of Public Affairs (Nov. 17, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-federalist-society-2017-national-lawyers.

24. He also issued a memorandum prohibiting all divisions of the Department of Justice from issuing guidance documents that have the effect of adopting new regulatory requirements or amending the law.  *See* Memorandum from the Attorney General to "All Components" Regarding Prohibition on Improper Guidance Documents (Nov. 16, 2017), https://www.justice.gov/opa/press-release/file/1012271/download ("November Memorandum").

25. Specifically, in the November Memorandum, Attorney General Sessions declared:
> [G]uidance may not be used as a substitute for rulemaking and may not be used to impose new requirements on entities outside the Executive Branch.  Nor

---

[4] *See also, e.g.*, Eliminating Unnecessary Tax Regulations, 83 Fed. Reg. 6806 (proposed Feb. 15, 2018) (IRS proposing to remove 298 tax regulations); Pesticides; Agricultural Worker Protection Standard; Reconsideration of Several Requirements and Notice About Compliance Dates, 82 Fed. Reg. 60,576 (proposed Dec. 21, 2017) (EPA notifying public it seeks to revise certain Agricultural Worker Protection Standard requirements); Claims Procedure for Plans Providing Disability Benefits; Extension of Applicability Date, 82 Fed. Reg. 47,409 (proposed Oct. 12, 2017) (Department of Labor proposing to delay applicability of the Final Rule amending claims procedure requirements for ERISA-covered employee benefit plans providing disability benefits); National Performance Management Measures, 82 Fed. Reg. 46,427 (proposed Oct. 5, 2017) (Federal Highway Administration notice of proposed rulemaking seeking to repeal the 2017 Greenhouse Gas performance measures for state departments of transportation and metropolitan planning organizations).

> should guidance create binding standards by which the Department will determine compliance with existing regulatory or statutory requirements.
>
> It has come to my attention that the Department has in the past published guidance documents—or similar instruments of future effect by other names, such as letters to regulated entities—that effectively bind private parties without undergoing the rulemaking process.

*Id.* at 1.

26. The press release announcing the issuance of the November Memorandum further elaborated that the "Attorney General's Regulatory Reform Task Force . . . will conduct a review of existing Department documents and will recommend candidates for repeal or modification in the light of this memo's principles." Press Release No. 17-1309, DOJ Office of Public Affairs, *Attorney General Jeff Sessions Ends the Departments Practice of Regulation by Guidance* (Nov. 17, 2017), https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-ends-department-s-practice-regulation-guidance.

27. And then-chair of the task force, Rachel Brand, stated: "Guidance documents . . . should not be used to change the law or to impose new standards to determine compliance with the law. The notice-and-comment process that is ordinarily required for rulemaking can be cumbersome and slow, but it has the benefit of availing agencies of more complete information about a proposed rule's effects than the agency could ascertain on its own. This Department of Justice will not use guidance documents to circumvent the rulemaking process, and *we will proactively work to rescind existing guidance documents that go too far*." *Id.* (emphasis added).

28. The following month, on December 21, 2017, Attorney General Sessions announced that, pursuant to Executive Order 13777 and his November Memorandum, he was rescinding twenty-five DOJ guidance documents that were "unnecessary, inconsistent with existing law, or otherwise improper." *See* Ex. A.

29. The vast majority of the documents—which dated back decades and covered topics as diverse as Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") procedures and the Americans with Disabilities Act—were aimed at protecting marginalized communities, including immigrants, people of color, the poor, and individuals with disabilities.

30. At the time he announced the repeal, Attorney General Sessions offered six short sentences in explanation:

> Last month, I ended the longstanding abuse of issuing rules by simply publishing a letter or posting a web page. Congress has provided for a regulatory process in statute, and we are going to follow it. This is good government and prevents confusing the public with improper and wrong advice.
>
> Therefore, any guidance that is outdated, used to circumvent the regulatory process, or that improperly goes beyond what is provided for in statutes or regulation should not be given effect. That is why today, we are ending 25 examples of improper or unnecessary guidance documents identified by our Regulatory Reform Task Force led by our Associate Attorney General Rachel Brand. We will continue to look for other examples to rescind, and we will uphold the rule of law.

*Id.*

31. Attorney General Sessions did not state why any of the twenty-five was specifically selected to be withdrawn. He provided no details on which documents had been deemed outdated, which were "unnecessary," or which were in some way improper because they imposed new binding rights or obligations on persons or entities outside the executive branch.

32. Components of DOJ provided additional explanation with respect to the rescission of certain documents in other places, noting that specific documents were outdated and explaining why. The ATF, for example, issued a ruling explaining that the ATF documents being withdrawn were "unnecessary . . . to the appropriate application of current law and regulation." ATF Ruling 2017-1, *Revoking Certain Guidance Documents*, DOJ Bureau of Alcohol, Tobacco, Firearms and Explosives, (Dec. 20, 2017), https://www.atf.gov/resource-center/docs/ruling/2017-1-revoking-certain-guidance-documents/download. It then listed the documents and explained exactly why each one had been deemed unnecessary—for example, ATF Procedure 75-4 was no longer necessary because the procedure it described had been "incorporated into the Application for Explosives License or Permit, ATF Form 5400," and ATF Ruling 85-3 was "made obsolete by amendments to 18 U.S.C. 922(b)(3)." *Id.*[5]

---

[5] S*ee also, e.g.*, *Section 4 of the Voting Rights Act*, DOJ Civil Rights Division, https://www.justice.gov/crt/section-4-voting-rights-act (last updated Dec. 21, 2017) (Civil Rights Division website explaining that guidance on bailing-out procedures under Section 4(b) and Section 5 of the Voting Rights Act was withdrawn because the Supreme Court's holding in *Shelby County v. Holder*, 570 U.S. __ (2013), that the coverage formula set forth in Section 4(b) of the Act was unconstitutional rendered guidance regarding bailout under Section 4(a) unnecessary); *Commonly*

33. But among the large swath of rescinded documents were six significant ones about which Defendants have provided no meaningful explanation.

### A. Statement Concerning Application Of The ADA's Integration Mandate To State And Local Governments.

34. One of the documents rescinded without adequate explanation was a "Statement of the Department of Justice on Application of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* to State and Local Governments' Employment Service Systems for Individuals with Disabilities." *See* Ex. B (the "Statement").

35. In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the Supreme Court ruled that pursuant to the integration mandate in Title II of the ADA, state and local governments must create pathways for people with disabilities to live in their own homes or group homes located within their communities, rather than isolating them in segregated institutions.

36. The repealed Statement, which was issued in 2016, explained to state and local governments how this ruling applied to their employment service systems.

37. Specifically, it provided answers to questions such as:

- "What is the ADA's Title II integration mandate, and how does it apply to state and local governments' employment service systems?" Ex. B at 3.
- "What is the most integrated setting under the ADA and *Olmstead* in the context of a state and local government's employment service system?" *Id.* at 4.
- "How can state and local governments' employment service systems ensure that people with disabilities have access to competitive integrated employment?" *Id.* at 5.

38. In answering these questions, DOJ affirmed that the integration mandate applied not only to where individuals with disabilities live, but also to where they spend their days—including at

---

*Asked Questions About Service Animals in Places of Business*, DOJ Civil Rights Division Disability Rights Section (July 1996), https://www.ada.gov/archive/qasrvc.htm ("[Commonly Asked Questions About Service Animals in Places of Business (July 1996)] has been withdrawn because it is outdated and was superseded by the current ADA title II and title III regulations . . . . For more information about the Department's withdrawn technical assistance and guidance documents, please go to: www.ada.gov/ta_withdrawn. html. For the current version of this document, please go to Frequently Asked Questions about Service Animals and the ADA.").

work. It explained that government work programs for people with disabilities were required to integrate employees with disabilities with their non-disabled peers. And it provided criteria to determine "the most integrated setting" for employment services for an individual with a disability, and a process to ensure that individuals with disabilities have access to competitive, integrated employment. *See generally* Ex. B.

39. According to disability advocates, the Statement was integral to helping people with disabilities across the country move away from isolated "sheltered workshops," where they are often paid much less than minimum wage and are vulnerable to exploitation and abuse.[6]

40. Attorney General Sessions withdrew the Statement without any meaningful explanation.

41. On ADA.gov, DOJ provided the following explanation for the withdrawal of this critical document: "This action was taken to afford further discussion with relevant stakeholders, including public entities and the disability community, as to how best to provide technical assistance in this area." *Withdrawal of the Statement of the Department of Justice on Application of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C. to State and Local Governments' Employment Service Systems for Individuals with Disabilities*, DOJ Civil Rights Division (Dec. 21, 2017), https://www.ada.gov/withdrawn_olmstead.html. This explanation, however, is entirely different from those given by Attorney General Sessions. It does not indicate that DOJ determined the Statement was outdated, or unnecessary, or improper. Rather, it introduces an entirely new rationale—that it was withdrawn to allow for further discussion and consideration of the principles addressed in the guidance.

---

[6] For this reason, its repeal has been met with widespread outrage from disability rights organizations. Indeed, over 200 disability organizations sent a letter to the Acting Assistant Attorney General for Civil Rights expressing concern over the effect the withdrawal will have on people with disabilities across the country. *See* Letter from Consortium for Citizens with Disabilities to AAG John Gore (Jan. 8, 2018), https://centerforpublicrep.org/wp-content/uploads/2017/12/letter-to-DOJ-re-withdrawal-of-guidance-1-5-18.pdf. The U.S. Commission on Civil Rights has also urged Attorney General Sessions to reconsider the withdrawal. *U.S. Commission on Civil Rights Strongly Criticizes Attorney General Jeff Sessions' Withdrawal of Critical Civil Rights Guidance*, U.S. Commission on Civil Rights (Jan. 19, 2018), http://usccr.gov/press/2018/01-19-PR-Sessions.pdf.

42. And elsewhere on ADA.gov, DOJ indicates that it withdrew the Statement because it was "*out-of-date, duplicative, or otherwise ineffective*" and its withdrawal would "make it easier for individuals with disabilities, covered entities, and the public to understand their rights and responsibilities under the ADA."  ADA.gov website, DOJ Civil Rights Division, https://www.ada.gov/ta_withdrawn.html (emphasis added).

43. In fact, there is reason to believe that the withdrawal of this guidance reflects a *sub rosa* substantive shift in federal interpretation and enforcement of Title II's integration mandate.  Sheltered workshops are profitable enterprises, and a national trade association for sheltered workshops began lobbying DOJ's new political leadership to repeal the *Olmstead* Statement in August 2017.  *See* David M. Perry, *Companies That Exploit Disabled People Have a Friend in Jeff Sessions*, Pacific Standard (Jan. 3, 2018), https://psmag.com/economics/jeff-sessions-roll-back-disability-rights.  In light of this background as well as the fact that eighteen of the comments submitted in response to the request for input on the Department's regulatory reform agenda urged a withdrawal of the *Olmstead* guidance and/or a change in the underlying substance, the repeal appears to indicate a meaningful shift in policy.

44. Given the vague and contradictory explanations proffered by Defendants, state and local governments, as well as the public, are left without any clear indication of why Defendants actually decided to withdraw this document.

**B.    Statement On Ability Of Local Government To Exercise Control Over Group Living Arrangements For People With Disabilities.**

45. Another one of the repealed documents was a joint statement by DOJ and the Department of Housing and Urban Development concerning the Fair Housing Act's effect on the ability of local governments to exercise control over group living arrangements, particularly for persons with disabilities ("Joint Statement").  *See* Ex. C.

46. This Joint Statement provided critical directions to local governments about what they may and may not do in compliance with federal law.  For instance, it explained that local governments may generally restrict the ability of unrelated groups of people to live together (subject

to reasonable accommodations), but cannot treat groups of unrelated persons with disabilities less favorably than similar groups of unrelated persons without disabilities.

47. Defendants did not provide any particularized explanation for withdrawing this document.

48. Through its own search, San Francisco was able to locate a later 2016 document that "updates and expands" upon the Joint Statement. *See* Joint Statement of the Department of Housing and Urban Development and the Department of Justice: *State and Local Land Use Laws and Practices and the Application of the Fair Housing Act* (Nov. 10, 2016), https://www.justice.gov/opa/file/912366/download. But there is material covered in the Joint Statement that does not appear to be included in the 2016 document, such as a discussion of the applicability of the anti-discrimination provisions of the Fair Housing Act to those claiming disability on the basis of having been adjudicated as a juvenile delinquent or for having a criminal record, or those who suffer from an addiction to illegal drugs. *See* Ex. C at 1.

49. In the absence of an explanation from Defendants for their decision to withdraw this document—*e.g.*, that they believe it has been completely supplanted by the 2016 document or that the Joint Statement was somehow incorrect or improper—there is no way for local governments to evaluate the validity of the justification or tailor their conduct accordingly.

**C.     Letters Concerning Standards For Assessing Citizenship Status Discrimination.**

50. The Immigration and Nationality Act ("INA") generally prohibits employers—including local governments—from discriminating against individuals on the basis of national origin or, in the case of "protected individual[s]," on the basis of citizenship status. 8 U.S.C. § 1324b(1).

51. Two of the documents Defendants repealed without any explanation were letters from the DOJ Civil Rights Division providing guidance about compliance with these anti-discrimination provisions of the INA.

52. In one letter, DOJ explained that individuals who fail to apply for naturalization within six months of becoming eligible to do so were not "protected individuals" within the meaning of Section 1324b, but were nonetheless protected against other forms of discrimination, including document abuse (which it defined as "the request for more or different documents, or the rejection of

reasonably genuine looking documents in the employment eligibility verification process based on national original or citizenship status"). *See* Ex. D.

53. In the other letter, the Department provided its view on what employers were required to do to conduct citizenship documentation audits in compliance with the law. For example, DOJ explained that employers must complete internal audits of I-9 forms in the same manner for every employee and "may not scrutinize more closely the I-9 forms and documentation of select employees on the basis of national origin or citizenship status." Ex. E at 2. The letter also stated that employers cannot accept documentation that does not reasonably appear to be genuine or relate to that employee. *Id.*

54. Defendants have not provided any explanation as to why these two letters in particular were selected for rescission.

55. Particularly given the recent increase in Immigration and Customs Enforcement ("ICE") I-9 audits,[7] and acting ICE Director Thomas Homan's recent directive to ICE agents to increase such worksite investigations by "four to five times,"[8] it is critically important for employers—including government employers like San Francisco—to know how to conduct internal audits legally and to understand DOJ's position on what is required of them. Without knowing why Defendants rescinded these letters, employers are left to guess where DOJ stands on these timely and sensitive issues.

**D.    Guidance Regarding Lawful And Equitable Imposition Of Fines and Fees.**

56. When people are convicted of a crime, they are often charged thousands of dollars in fines, fees, or financial penalties related to their conviction, sentence, or incarceration. But an unintended consequence of this practice is that it can push people into (or deeper into) poverty. These fines, fees, and penalties can trap people in a cycle of debt, and low-income individuals and

---

[7] *See, e.g.*, Andrew Khouri, *Visits by federal immigration authorities are spooking California businesses and workers*, L.A. Times (Feb. 26, 2018), http://www.latimes.com/business/la-fi-immigration-workplace-20180226-story.html.

[8] *See* Tal Kopan, *ICE chief pledges quadrupling or more of workplace crackdowns*, CNN.com (Oct. 17, 2017), https://www.cnn.com/2017/10/17/politics/ice-crackdown-workplaces/index.html.

people of color are often hit the hardest. Government thus becomes a driver of inequality, creating additional layers of punishment for those moving through the criminal justice system.

57. Two of the documents Defendants withdrew without any explanation were resources to help state and local governments address this problem by reforming their fines and fees practices to comply with the Constitution and federal law, to avoid perpetuating poverty, and to avert unnecessary deprivations of liberty and equal protection.

58. One was a "Dear Colleague" letter issued as part of a package "meant to support the ongoing work of state judges, court administrators, policymakers and advocates in ensuring equal justice for all people, regardless of financial circumstance." Press Release No. 16-285, DOJ Office of Public Affairs, *Justice Department Announces Resources to Assist State and Local Reform of Fine and Fee Practices* (March 14, 2016). The letter provided guidance to state and local courts regarding their legal obligations with respect to the enforcement of court fines and fees. Specifically, it set forth seven requirements that had to be followed to be considered in compliance with the United States Constitution and/or other federal laws. *See* Ex. F.

59. The other was an advisory for recipients of financial assistance from DOJ on levying fines and fees on juveniles ("Juvenile Fines and Fees Advisory"). The stated intent of the advisory was to assist state and local juvenile probation departments, juvenile courts, and other juvenile justice agencies in ensuring that their imposition and enforcement of fines and fees did not violate the Constitution or the nondiscrimination provisions associated with the acceptance of federal financial assistance. To that end, it set forth DOJ's understanding of the constitutional and statutory obligations related to collecting fines and fees from juveniles, summarized the enforcement actions available to DOJ in the event it discovered evidence of a violation, and offered recommendations to improve the administration of juvenile fines and fees. *See* Ex. G.

60. These guidance documents have formed the basis for widespread reform to stem unconstitutional practices. They prompted numerous states to review their policies on fines and fees. The chair of Arkansas's Joint Committee, which was tasked with this review, noted, "The DOJ letter had a profound impact on every judge that read it. For those judges that perceived these issues prior to the letter but were unable to generate enthusiasm for change, the letter provided a perfect platform

for review and modification of policies and procedures." U.S. Commission on Civil Rights, *Targeted Fines and Fees Against Low-Income Communities of Color: Civil Rights and Constitutional Implications* 51-52 (Sept. 2017). In Texas, the court system's administrative director remarked that the Dear Colleague Letter "was very helpful and very well received by the judges across the state." Chiraag Bains, *Sessions Says to Courts: Go Ahead, Jail People Because They're Poor*, N.Y. Times (Dec. 28, 2017), https://www.nytimes.com/2017/12/28/opinion/sessions-says-to-courts-go-ahead-jail-people-because-theyre-poor.html. In addition, the American Bar Association has explicitly endorsed the seven principles emphasized in these documents, while the Conference on State Court Administrators refers to the Dear Colleague Letter in its policy paper on ending debtors' prisons.

61. More specifically, the "Dear Colleague" letter and the Juvenile Fines and Fees Advisory provided important guidance to San Francisco—and other local and state governments—about criminal justice fines and fees.

62. San Francisco's Adult Probation Department and Juvenile Probation Department are authorized to impose and collect fees governed by these guidance documents:

- San Francisco's Adult Probation Department is led by a Chief Probation Officer who is appointed by and acts as an arm of the San Francisco Superior Court. Pursuant to state law, the Adult Probation Department collects $50 a month from adult probationers. These individuals are typically charged $1,800 upfront when they start their probation, as probation typically lasts for three years.

- State and local laws also authorize the Adult Probation Department to collect fees from clients for a variety of other services, including a booking fee, a criminal justice administration fee, a home detention fee, and an electronic monitoring fee.

- San Francisco's Juvenile Probation Department receives federal funding, including, in recent years, funding from the United States Department of Justice Office of Justice Programs.

- State and local laws authorize the Juvenile Probation Department to collect various fees.

63. The DOJ and private plaintiffs have relied on these documents in evaluating the conduct of local governments. For example, the Department of Justice used this guidance in reviewing whether Sacramento County's collection of juvenile justice fines and fees complied with applicable federal civil rights laws. In another example, in a legal challenge to automatic license suspensions for failures to pay traffic fines and fees in Solano County, California, plaintiffs cited the letter's discussion of the unnecessary harms resulting from unfair fines and fees. *See* Complaint at 8, *Rubicon Programs v. Superior Court of Cal. Cty. of Solano*, No. FCS047212 (Solano Super. Ct. June 15, 2016).

64. Defendants have offered no particularized explanation for the withdrawal of these documents. Were they withdrawn because DOJ believed they improperly imposed new binding obligations on entities outside the executive branch? Or because DOJ concluded they were outdated? We do not know, but the difference is important, as each possible rationale for the repeal represents a different potential policy shift that is relevant for the activities of both the regulated community and for DOJ employees reviewing state and local governments' compliance with the law.

\* \* \*

65. All of these Documents were practically and legally significant.

66. Practically, they helped to protect the civil rights of marginalized individuals across the country. They reduced financial burdens on the poor and helped ensure equal access to justice. They protected immigrants from discriminatory employment practices. And they advanced the rights of disabled people to live and work in the most appropriate settings.

67. Legally, they provided guidance to regulated entities. Guidance letters describing the Department's interpretation of the Constitution and/or federal laws carry an implicit threat that parties that do not follow their recommendations might face federal lawsuits or a loss of federal aid—and an implicit assurance that parties who *do* follow them will be safe from prosecution or administrative action. The withdrawal of these documents eliminated those safe harbors.

68. Moreover, based on Attorney General Sessions' statements (*see* ¶¶ 23–30, *supra*), it is apparent that at least some of the Documents were rescinded because Defendants believed they improperly imposed binding obligations on individuals and/or entities outside the executive branch.

In other words, according to DOJ, some of the Documents contained obligations that have now been removed. Accordingly, legal consequences flow from this rescission.

69. Without an explanation from Defendants about the rationale for the repeal of each of these documents, however, we are left to "guess at what theory underl[ies] the agency's action." *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.").

70. When the court "is left to guess as to the agency's findings or reasons," the agency's action "simply cannot be upheld." *Time, Inc. v. U.S. Postal Serv.*, 685 F.2d 760, 773 (2d Cir. 1982) (quoting *Greater Boston Television Corp. v. F.C.C.*, 444 F.2d 841, 851 (D.C. Cir. 1970)).

**COUNT ONE:**
**AGENCY ACTION THAT IS ARBITRARY AND CAPRICIOUS**
**IN VIOLATION OF 5 U.S.C. § 706(2)(A)**

71. The above paragraphs are incorporated herein by reference.

72. DOJ is an agency subject to the requirements of the APA. 5 U.S.C. § 701(b)(1).

73. Under 5 U.S.C. § 706(2)(A), courts shall hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

74. The rescission of the Documents constitutes final agency action that is reviewable by this Court.

75. The rescission of the Documents and actions taken by Defendants to rescind the six guidance documents are arbitrary and capricious, an abuse of discretion, and not in accordance with law because, among other things, Defendants failed to articulate a meaningful explanation for their actions.

76. Under the APA, agencies must demonstrate that they engaged in reasoned decision-making when reaching a determination, and this includes policy changes made through repeals. *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2120 (2016). The agency's explanation for its decision must be clear enough that the agency's "path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974). In the absence of any specific reasoning, "[i]t is not the role of the courts to speculate on reasons that might have supported

an agency's decision," and the action must be deemed arbitrary and capricious. *Encino Motorcars*, 136 S. Ct. at 2127.

77.     This is particularly true where, as here, the rescinded policies engendered reliance interests. *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) ("[T]he APA requires an agency to provide more substantial justification when 'its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.  It would be arbitrary and capricious to ignore such matters.'" *Id*. (quoting *F.C.C. v. Fox Television Stations, Inc*., 556 U.S. 502, 515 (2009)).

78.     San Francisco and its residents were harmed and continue to be harmed by these unlawful acts.

**PRAYER FOR RELIEF**

Wherefore, San Francisco prays that the Court grant the following relief:

1.     Vacate and set aside the rescission of the Documents and any action taken by Defendants to implement rescission of the Documents;

2.     Declare that the rescission of the Documents and actions taken by Defendants to rescind the Documents are void and without legal force or effect;

3.     Declare that the rescission of the Documents and actions taken by Defendants to rescind the Documents are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of 5 U.S.C. § 706;

4.     Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them, from implementing or enforcing the rescission of the Documents and from taking any other action to rescind the Documents that is not in compliance with applicable law;

5.     Award San Francisco reasonable costs and attorneys' fees; and

//
//
//
//

6. Grant any other further relief that the Court deems fit and proper.

Dated: April 5, 2018

DENNIS J. HERRERA
City Attorney
JESSE C. SMITH
RONALD P. FLYNN
YVONNE R. MERÉ
MOLLIE M. LEE
SARA J. EISENBERG

Deputy City Attorneys


By: */s/ Dennis J. Herrera*
DENNIS J. HERRERA
City Attorney

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

Complaint;
CCSF v. Jefferson B. Sessions III, et al; Case No.

19    N:\AFFIRM\LI2018\181193\01266072.docx