DENNIS J. HERRERA, State Bar #139669
City Attorney
JESSE C. SMITH, State Bar #122517
Chief Assistant City Attorney
RONALD P. FLYNN, State Bar #184186
Chief Deputy City Attorney
YVONNE R. MERÉ, State Bar #173594
Chief of Complex and Affirmative Litigation
MOLLIE M. LEE, State Bar #251404
SARA J. EISENBERG, State Bar #269303
Deputy City Attorneys
City Hall, Room 234
1 Dr. Carlton B. Goodlett Place
San Francisco, California 94102-4602
Telephone:     (415) 554-4748
Facsimile:     (415) 554-4715
E-Mail:        brittany.feitelberg@sfcityatty.org

Attorneys for Plaintiff
CITY AND COUNTY OF SAN FRANCISCO

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO,<br><br>        Plaintiff,<br><br>    vs.<br><br>JEFFERSON B. SESSIONS III, Attorney General of the United States, UNITED STATES DEPARTMENT OF JUSTICE, DOES 1-100,<br><br>        Defendants. | Case No. 18-cv-2068-JST<br><br>**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

**INTRODUCTION**

1.      This lawsuit challenges Defendants' bulk rescission of a wide swath of Department of Justice ("DOJ" or "Department") guidance documents setting forth DOJ's interpretation of laws that protect immigrants, the poor, people of color, and people with disabilities.  The documents—which provided guidance to regulated entities and helped to protect the civil rights of marginalized individuals across the country—were withdrawn without any meaningful explanation, as required by the Administrative Procedure Act ("APA").  Such an unexplained bulk repeal was unprecedented prior to this administration.  The rescission was arbitrary and capricious, and should be vacated.

2.      The stated mission of DOJ is "to ensure fair and impartial administration of justice for all Americans."  Yet, over the past year and a half, the Department—under the leadership of Attorney General Jefferson B. Sessions—has shown a shocking disregard for protecting the rights of vulnerable communities, rolling back civil rights initiatives in a wide variety of areas.  Barely a month into the Trump administration, for example, the Department dropped the federal government's longstanding position that a Texas voter ID law under legal challenge was intentionally racially discriminatory.  Shortly thereafter, DOJ attempted—unsuccessfully—to block a court from approving a consent decree negotiated by the Department following an extensive multi-year investigation that aimed to reform discriminatory police practices in the Baltimore Police Department.  The DOJ also effectively shut down the Office for Access to Justice ("ATJ"), which was dedicated to improving legal resources for indigent litigants in civil, criminal, and tribal courts.  ATJ's offices now sit dark in the Justice Department building.

3.      And, in December 2017, Attorney General Sessions rescinded twenty-five DOJ guidance documents—most of which were aimed at protecting marginalized communities.

4.      In a press release announcing the repeal, Attorney General Sessions declared—in broad conclusory terms—that the documents were being withdrawn because they were "unnecessary, inconsistent with existing law, or otherwise improper."  *See* Press Release No. 17-1469, DOJ Office of Public Affairs, *Attorney General Jeff Sessions Rescinds 25 Guidance Documents* (Dec. 21, 2017) (attached hereto as Exhibit A).  He also stated generally that "any guidance that is outdated, used to circumvent the regulatory process, or that improperly goes beyond what is provided for in statutes or

1    regulation should not be given effect." *Id.* He did not explain which rationale allegedly applied to

2    which document or offer any other particularized justification.

3          5.     Elsewhere, components of DOJ have offered additional explanation for the repeal of

4    some of the guidance documents. For example, the Civil Rights Division explains on its website that

5    the guidance on bailing-out procedures under Section 4(b) and Section 5 of the Voting Rights Act was

6    withdrawn because the "Supreme Court's decision in Shelby County v. Holder, 570 U.S. ___ (2013)

7    held that the coverage formula set forth in Section 4(b) of the Act was unconstitutional, and as a

8    consequence, no jurisdictions are now subject to the coverage formula in Section 4(b) or to Sections

9    4(f)(4) and 5 of Act. Accordingly, guidance regarding bailout under Section 4(a) is no longer

10   necessary." *See Section 4 of the Voting Rights Act*, DOJ Civil Rights Division, https://www.justice.

11   gov/crt/section-4-voting-rights-act (last updated Dec. 21, 2017).

12         6.     But slipped into the mix of the twenty-five repealed documents were six significant

13   civil rights documents that Defendants provided no meaningful explanation for withdrawing. All six

14   provided critical guidance to state and local governments about compliance with federal laws. Among

15   them were procedures to help state and local governments eliminate unlawful fees against juvenile

16   offenders, standards outlining discrimination protections for disabled individuals in government

17   employment service systems, and guidance for employers about compliance with the anti-

18   discrimination provisions of the Immigration and Nationality Act.

19         7.     The rescission of these documents has been decried by disability rights groups and civil

20   rights activists.[1] Indeed, the United States Commission on Civil Rights—an independent, bipartisan

21   federal agency charged with advising the President and Congress on civil rights matters—issued a

22   statement "strongly criticiz[ing]" the withdrawal of the "recent, narrowly crafted, urgently applicable

23

24          [1] *See, e.g.*, *Lawyers' Committee for Civil Rights Under Law Condemns DOJ's Decision to
     Revoke Critical Legal Guidance Documents*, Lawyers' Committee for Civil Rights (Dec. 22, 2017),
25   https://www.commondreams.org/newswire/2017/12/22/lawyers-committee-civil-rights-under-law-
     condemns-dojs-decision-revoke-critical ("We condemn Attorney General Sessions's latest attempt to
26   turn back the clock on civil rights progress . . . ."); *DOJ Withdraws Olmstead Employment Guidance*,
     Letter to DOJ in Response to Olmstead Guidance Withdrawal from Over 200 Disability
27   Organizations, Center for Public Representation (Jan. 5, 2018), https://centerforpublicrep.org/
     initiative/doj-withdraws-olmstead-employment-guidance/.
28

guidance documents." *U.S. Commission on Civil Rights Strongly Criticizes Attorney General Jeff Sessions' Withdrawal of Critical Civil Rights Guidance*, U.S. Commission on Civil Rights (Jan. 19, 2018), http://usccr.gov/press/2018/01-19-PR-Sessions.pdf.  The Commission "call[ed] for Attorney General Sessions immediately to correct the civil rights harm his guidance withdrawal works on our nation's social fabric by reinstating the guidance, signaling the necessary ongoing leadership of the nation's Department of Justice in actually securing justice for the people." *Id.*

8.     Despite the outcry and outrage that followed this initial bulk rescission, Attorney General Sessions rescinded twenty-four *additional* DOJ guidance documents in July 2018.  Once again, most of the documents were aimed at protecting marginalized communities—including a technical assistance manual to help state and local juvenile justice agencies address the widespread and serious problem of disproportionate minority contact with the juvenile justice system.  In a press release announcing the second bulk repeal, Attorney General Sessions declared that DOJ was rescinding the twenty-four additional documents as part of the continuing effort "to put an end to unnecessary or improper rulemaking."  *See* Press Release No. 18-883, DOJ Office of Public Affairs, *Attorney General Jeff Sessions Rescinds 24 Guidance Documents* (July 3, 2018) (attached hereto as Exhibit H).  But neither Attorney General Sessions nor anyone else in DOJ has explained whether the technical assistance manual was determined to be unnecessary, or improper, or outdated.  Nor has anyone provided any other particularized and substantive justification for repealing this important document.

9.     Defendants' failure to provide any meaningful explanation for the repeal of these documents is galling—and unlawful.  The APA requires agencies to disclose the basis of their decisions, including policy changes made through repeals.  They must demonstrate that they engaged in reasoned decision-making.  And the explanation for their decision cannot be conclusory; it must be clear enough that the agency's "path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

10.    The APA imposes these requirements for an important reason.  A fundamental tenet of our administrative system is that agency decision-making should not happen in the shadows.  The APA's procedural requirements exist to allow members of the public—and the courts—to understand

1  and evaluate the legitimacy and consequences of the agency's action.  In the absence of such an

2  explanation, the public is left to guess whether Defendants believe the repealed documents are

3  outdated—and, if so, whether a different document controls—or improperly imposed binding

4  obligations that should have been issued through notice-and-comment rulemaking.  Regulated entities

5  like San Francisco and the individuals impacted by the rescission of the documents cannot evaluate the

6  validity of the repeal, challenge it if necessary, or tailor their conduct appropriately when agency

7  action is opaque.

8      11.     The public is entitled to—and the APA demands—more from our federal government.

9                          **JURISDICTION AND VENUE**

10     12.     The Court has jurisdiction under 28 U.S.C. Sections 1331 and 1346.  This Court has

11  further remedial authority under the Declaratory Judgment Act, 28 U.S.C. Sections 2201 and 2202 *et*

12  *seq.*  There exists an actual and justiciable controversy between Plaintiff and Defendants requiring

13  resolution by this Court.  Plaintiff has no adequate remedy at law.

14     13.     Venue properly lies within the Northern District of California because this is a civil

15  action in which Defendants are an agency, or officers of an agency, of the United States, because a

16  substantial part of the events or omissions giving rise to this action occurred in the District, and,

17  further, because Plaintiff resides in this District and no real property is involved in the action.  28

18  U.S.C. § 1391(e).

19                          **INTRADISTRICT ASSIGNMENT**

20     14.     Pursuant to Civil Local Rule 3-2(c), it is appropriate to assign this case to the San

21  Francisco Division or Oakland Division of this Court because the action arises in San Francisco

22  County.

23                                  **PARTIES**

24     15.     Plaintiff City and County of San Francisco ("San Francisco" or "City") is a municipal

25  corporation organized and existing under and by virtue of the laws of the State of California, and is a

26  charter city and county.

27  //

28  //

16.     Defendant Jefferson B. Sessions is the Attorney General of the United States.  He is sued in his official capacity.  The Attorney General is the federal official leading the DOJ, which is responsible for the governmental actions at issue in this lawsuit.

17.     Defendant DOJ is an executive department of the United States of America and an agency within the meaning of 5 U.S.C. § 551(1).  DOJ has responsibility for, among other things, administering and enforcing the Civil Rights Acts of 1957, 1960, 1964, and 1968, as amended; the Voting Rights Act of 1965, as amended; the Juvenile Justice and Delinquency Prevention Act of 2002; the Fair Housing Act of 1968; and the Fair Housing Amendments Act of 1988.  In addition, DOJ is charged with all departmental responsibilities under the Americans with Disabilities Act of 1990.

18.     Doe 1 through Doe 100 are sued under fictitious names.  Plaintiff San Francisco does not now know the true names or capacities of said Defendants, who were responsible for the alleged violations, but pray that the same may be alleged in this complaint when ascertained.

## FACTUAL ALLEGATIONS

19.     In February 2017, President Trump issued Executive Order 13777, "Enforcing the Regulatory Reform Agenda," in which he ordered each executive agency to create a "Regulatory Reform Task Force" to identify regulatory actions for elimination.  Exec. Order No. 13,777, 82 Fed. Reg. 12,285 (Feb. 24, 2017).

20.     DOJ established the required task force and installed former Associate Attorney General Rachel Brand as the chair[2]—but has refused to provide information to the public about other task force members.[3]

---

[2] Rachel Brand left DOJ in February 2018.  DOJ has not disclosed who—if anyone—replaced her as chair of the task force.

[3] *See* Robert Faturechi, *Secrecy and Suspicion Surround Trump's Deregulation Teams*, ProPublica (Aug. 7, 2017), https://www.propublica.org/article/secrecy-and-suspicion-surround-trumps-deregulation-teams ("In an email exchange, a spokesman, Ian Prior, said he could not provide additional names because 'the Task Force is made up of components, not particular employees.'  'A component may have multiple employees assisting with the work,' he added.  Asked if he could name any of those employees, he responded, 'Decline.'").

Indeed, ignoring multiple requests by members of Congress to disclose Regulatory Reform Task Force members leading regulatory rollback efforts, DOJ and other agencies "are actively hiding their members and their meetings from public view."  Letter from Rep. Elijah Cummings et al. to Mick Mulvaney & Neomi Rao (Aug. 7, 2017).  As a result, senior members of the House of Representatives Committee of Oversight and Government Reform have requested subpoenas to

21.     On June 28, 2017, the DOJ Task Force published a Request for Public Comment in the Federal Register seeking input on regulatory actions that should be considered for repeal, replacement, or modification.  Enforcing the Regulatory Reform Agenda; Department of Justice Task Force on Regulatory Reform Under E.O. 13777, 82 Fed. Reg. 29,248 (proposed June 28, 2017).  This cursory notice requested public comment in broad terms without reference to any specific regulation or document.

22.     Among the comments submitted was a request by the Leadership Conference on Civil and Human Rights for DOJ to identify individual regulations and policies it was considering for repeal.  Letter from Kristine Lucius, Executive Vice President, the Leadership Conference on Civil and Human Rights, to Robert Hinchman, Senior Counsel of the Office of Legal Policy, DOJ (Aug. 14, 2017), https://www.regulations.gov/document?D=DOJ-OLP-2017-0007-0013.  The Leadership Conference explained that in order to provide meaningful comments, it "would need the Department to give proper notice of which specific regulations or policies it is considering repealing, replacing, or modifying." *Id.*

23.     Other agencies did this—publishing notice in the Federal Register of the specific rules and regulations considered for repeal or modification.  For example, the U.S. Patent and Trademark Office published a proposal to remove regulations governing reservation clauses, petitions from a primary examiner's refusal to admit an amendment, and other specific rules pursuant to Executive Order 13777.  *See* Changes To Eliminate Unnecessary Regulations, 83 Fed. Reg. 2759-60 (proposed Jan. 19, 2018).[4]  DOJ, however, provided no further information on the specific documents being considered for repeal.

---

compel DOJ to provide the names of their task force members.  *See* Letter from Rep. Elijah E. Cummings to Rep. Trey Gowdy (Mar. 13, 2018).

[4] *See also, e.g.*, Eliminating Unnecessary Tax Regulations, 83 Fed. Reg. 6806 (proposed Feb. 15, 2018) (IRS proposing to remove 298 tax regulations); Pesticides; Agricultural Worker Protection Standard; Reconsideration of Several Requirements and Notice About Compliance Dates, 82 Fed. Reg. 60,576 (proposed Dec. 21, 2017) (EPA notifying public it seeks to revise certain Agricultural Worker Protection Standard requirements); Claims Procedure for Plans Providing Disability Benefits; Extension of Applicability Date, 82 Fed. Reg. 47,409 (proposed Oct. 12, 2017) (Department of Labor proposing to delay applicability of the Final Rule amending claims procedure requirements for ERISA-covered employee benefit plans providing disability benefits); National Performance Management Measures, 82 Fed. Reg. 46,427 (proposed Oct. 5, 2017) (Federal Highway Administration notice of proposed rulemaking seeking to repeal the 2017 Greenhouse Gas

24.     Instead, on November 17, 2017, Attorney General Sessions stated at the Federalist Society 2017 National Lawyers Convention that "[w]e have prohibited all Department of Justice components from issuing any guidance that purports to impose new obligations on any party outside the Executive Branch.  We will review and repeal existing guidance documents that violate this common sense principle."  *See Attorney General Sessions Delivers Remarks at the Federalist Society 2017 National Lawyers Convention*, DOJ Office of Public Affairs (Nov. 17, 2017), https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-federalist-society-2017-national-lawyers.

25.     He also issued a memorandum prohibiting all divisions of the Department of Justice from issuing guidance documents that have the effect of adopting new regulatory requirements or amending the law.  *See* Memorandum from the Attorney General to "All Components" Regarding Prohibition on Improper Guidance Documents (Nov. 16, 2017), https://www.justice.gov/opa/press-release/file/1012271/download ("November Memorandum").

26.     Specifically, in the November Memorandum, Attorney General Sessions declared:

> [G]uidance may not be used as a substitute for rulemaking and may not be used to impose new requirements on entities outside the Executive Branch.  Nor should guidance create binding standards by which the Department will determine compliance with existing regulatory or statutory requirements.

> It has come to my attention that the Department has in the past published guidance documents—or similar instruments of future effect by other names, such as letters to regulated entities—that effectively bind private parties without undergoing the rulemaking process.

*Id.* at 1.

27.     The press release announcing the issuance of the November Memorandum further elaborated that the "Attorney General's Regulatory Reform Task Force . . . will conduct a review of existing Department documents and will recommend candidates for repeal or modification in the light of this memo's principles."  Press Release No. 17-1309, DOJ Office of Public Affairs, *Attorney General Jeff Sessions Ends the Departments Practice of Regulation by Guidance* (Nov. 17, 2017),

---

performance measures for state departments of transportation and metropolitan planning organizations).

https://www.justice.gov/opa/pr/attorney-general-jeff-sessions-ends-department-s-practice-regulation-guidance.

28.     And then-chair of the task force, Rachel Brand, stated: "Guidance documents . . . should not be used to change the law or to impose new standards to determine compliance with the law.   The notice-and-comment process that is ordinarily required for rulemaking can be cumbersome and slow, but it has the benefit of availing agencies of more complete information about a proposed rule's effects than the agency could ascertain on its own.  This Department of Justice will not use guidance documents to circumvent the rulemaking process, and *we will proactively work to rescind existing guidance documents that go too far*."  *Id.* (emphasis added).

29.     The following month, on December 21, 2017, Attorney General Sessions announced that, pursuant to Executive Order 13777 and his November Memorandum, he was rescinding twenty-five DOJ guidance documents that were "unnecessary, inconsistent with existing law, or otherwise improper."  *See* Ex. A.

30.     The vast majority of the documents—which dated back decades and covered topics as diverse as Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") procedures and the Americans with Disabilities Act—were aimed at protecting marginalized communities, including immigrants, people of color, the poor, and individuals with disabilities.

31.     At the time he announced the repeal, Attorney General Sessions offered six short sentences in explanation:

> Last month, I ended the longstanding abuse of issuing rules by simply publishing a letter or posting a web page.  Congress has provided for a regulatory process in statute, and we are going to follow it.  This is good government and prevents confusing the public with improper and wrong advice.
>
> Therefore, any guidance that is outdated, used to circumvent the regulatory process, or that improperly goes beyond what is provided for in statutes or regulation should not be given effect.  That is why today, we are ending 25 examples of improper or unnecessary guidance documents identified by our Regulatory Reform Task Force led by our Associate Attorney General Rachel Brand.  We will continue to look for other examples to rescind, and we will uphold the rule of law.

*Id.*

32.     Attorney General Sessions did not state why any of the twenty-five was specifically selected to be withdrawn.  He provided no details on which documents had been deemed outdated,

which were "unnecessary," or which were in some way improper because they imposed new binding

rights or obligations on persons or entities outside the executive branch.

33.     On July 3, 2018, Attorney General Sessions announced that DOJ had rescinded twenty-

four *additional* DOJ guidance documents that purportedly "were unnecessary, outdated, inconsistent

with existing law, or otherwise improper."  *See* Ex. H.

34.     Once again, most of the documents DOJ selected for repeal were aimed at protecting

marginalized communities.  Once again, several of them provided critical guidance to state and local

governments about compliance with federal laws.  And once again, Attorney General Sessions did not

state why any of the twenty-four was specifically selected to be withdrawn—he provided no details on

which documents had been deemed outdated, which were "unnecessary," or which were in allegedly

"inconsistent with existing law" or in some other way "improper."

35.     Components of DOJ provided additional explanation with respect to the rescission of

certain documents in other places, noting that specific documents were outdated and explaining why.[5]

The ATF, for example, issued a ruling explaining that the ATF documents being withdrawn were

"unnecessary . . . to the appropriate application of current law and regulation."  ATF Ruling 2017-1,

*Revoking Certain Guidance Documents*, DOJ Bureau of Alcohol, Tobacco, Firearms and Explosives,

(Dec. 20, 2017), https://www.atf.gov/resource-center/docs/ruling/2017-1-revoking-certain-guidance-

documents/download.  It then listed the documents and explained exactly why each one had been

deemed unnecessary—for example, ATF Procedure 75-4 was no longer necessary because the

procedure it described had been "incorporated into the Application for Explosives License or Permit,

ATF Form 5400," and ATF Ruling 85-3 was "made obsolete by amendments to 18 U.S.C. 922(b)(3)."

*Id.*[6]

---

[5] The City reserves the right to challenge the sufficiency or validity of these explanations.  The City's current claims, however, focus on Defendants' decision to rescind documents without providing *any* meaningful and particularized explanation whatsoever.

[6] S*ee also, e.g.*, *Section 4 of the Voting Rights Act*, DOJ Civil Rights Division, https://www.justice.gov/crt/section-4-voting-rights-act (last updated Dec. 21, 2017) (Civil Rights Division website explaining that guidance on bailing-out procedures under Section 4(b) and Section 5 of the Voting Rights Act was withdrawn because the Supreme Court's holding in *Shelby County v. Holder*, 570 U.S. 529 (2013), that the coverage formula set forth in Section 4(b) of the Act was unconstitutional rendered guidance regarding bailout under Section 4(a) unnecessary); *Commonly*

36.     But among the large swath of rescinded documents were eight significant ones about which Defendants have provided no meaningful explanation (referred to collectively as "Documents").

A.     **Statement Concerning Application Of The ADA's Integration Mandate To State And Local Governments.**

37.     One of the documents rescinded without adequate explanation was a "Statement of the Department of Justice on Application of the Integration Mandate of Title II of the Americans with Disabilities Act and *Olmstead v. L.C.* to State and Local Governments' Employment Service Systems for Individuals with Disabilities."  *See* Ex. B (the "*Olmstead* Guidance").

38.     In *Olmstead v. L.C.*, 527 U.S. 581 (1999), the Supreme Court ruled that pursuant to the integration mandate in Title II of the ADA, state and local governments must create pathways for people with disabilities to live in their own homes or group homes located within their communities, rather than isolating them in segregated institutions.

39.     The repealed *Olmstead* Guidance, which was issued in 2016, explained to state and local governments how this ruling applied to their employment service systems.

40.     Specifically, it provided answers to questions such as:

- "What is the ADA's Title II integration mandate, and how does it apply to state and local governments' employment service systems?"  Ex. B at 3.

- "What is the most integrated setting under the ADA and *Olmstead* in the context of a state and local government's employment service system?"  *Id.* at 4.

---

*Asked Questions About Service Animals in Places of Business*, DOJ Civil Rights Division Disability Rights Section (July 1996), https://www.ada.gov/archive/qasrvc.htm ("[Commonly Asked Questions About Service Animals in Places of Business (July 1996)] has been withdrawn because it is outdated and was superseded by the current ADA title II and title III regulations . . . .  For more information about the Department's withdrawn technical assistance and guidance documents, please go to: www.ada.gov/ta_withdrawn. html.  For the current version of this document, please go to Frequently Asked Questions about Service Animals and the ADA."); *Dear Colleague Letter*, U.S. Dept. of Educ. (July 3, 2018), available at https://www2.ed.gov/about/offices/list/ocr/letters/colleague-title-vi-201807.pdf ("The Departments have reviewed the documents and have concluded that they advocate policy preferences and positions beyond the requirements of the Constitution, Title IV, and Title VI. . . . [T]he documents are [also] inconsistent with governing principles for agency guidance documents.").

- "How can state and local governments' employment service systems ensure that people with disabilities have access to competitive integrated employment?"  *Id.* at 5.

41.     In answering these questions, DOJ affirmed that the integration mandate applied not only to where individuals with disabilities live, but also to where they spend their days—including at work.  It explained that any work programs for people with disabilities that a government planned, funded, administered, operated, or implemented were required to integrate employees with disabilities with their non-disabled peers in order to comply with the ADA.  And it provided criteria to determine "the most integrated setting" for employment services for an individual with a disability, and a process to ensure that individuals with disabilities have access to competitive, integrated employment.  *See generally* Ex. B.

42.     According to disability advocates, the *Olmstead* Guidance was integral to helping people with disabilities across the country move away from isolated "sheltered workshops," where they are often paid much less than minimum wage and are vulnerable to exploitation and abuse.[7]

43.     The *Olmstead* Guidance has also been integral to San Francisco's ongoing efforts to comply with the ADA.

44.     San Francisco operates, funds, and/or oversees several employment programs for its residents, including those with disabilities.  The *Olmstead* Guidance was critical to San Francisco's efforts to implement these public programs, evaluate their compliance with federal law, and help them improve.

45.     For example, San Francisco's Access to City Employment ("ACE") Program provides employment opportunities to individuals with disabilities by allowing them to qualify for certain city jobs without needing to go through the competitive civil service application process.  The *Olmstead*

---

[7] For this reason, its repeal has been met with widespread outrage from disability rights organizations.  Indeed, over 200 disability organizations sent a letter to the Acting Assistant Attorney General for Civil Rights expressing concern over the effect the withdrawal will have on people with disabilities across the country.  *See* Letter from Consortium for Citizens with Disabilities to AAG John Gore (Jan. 8, 2018), https://centerforpublicrep.org/wp-content/uploads/2017/12/letter-to-DOJ-re-withdrawal-of-guidance-1-5-18.pdf.  The U.S. Commission on Civil Rights has also urged Attorney General Sessions to reconsider the withdrawal.  *U.S. Commission on Civil Rights Strongly Criticizes Attorney General Jeff Sessions' Withdrawal of Critical Civil Rights Guidance*, U.S. Commission on Civil Rights (Jan. 19, 2018), http://usccr.gov/press/2018/01-19-PR-Sessions.pdf.

1    Guidance helped the Mayor's Office on Disability ("MOD") assess the ACE program's compliance

2    with the ADA and achieve its goals.

3        46.    It also helped MOD—which is responsible for overseeing the implementation and local

4    enforcement of San Francisco's obligations under the ADA—provide advice to City departments and

5    contractors about how to ensure compliance with the integration mandate of Title II.

6        47.    One such department, which provides employment services to people with disabilities

7    through contractors, is the San Francisco Office of Economic and Workforce Development

8    ("OEWD").

9        48.    OEWD receives federal funds under the Workforce Innovation and Opportunity Act

10   ("WIOA") as well as Community Development Block Grants ("CDBG") from the Department of

11   Housing and Urban Development.  It uses those funds to, among other things, fund contracts with non-

12   profit organizations to provide services to San Francisco residents with disabilities.  Specifically,

13   OEWD provides funding to Toolworks, The Arc, and Positive Resource Center ("PRC").

14       49.    Toolworks provides a variety of employment related services to people with

15   disabilities.  They provide job coaching and placement, which can result in placement in a fully

16   integrated job or a job in a more supportive setting, depending on the needs of the individual client.

17   They operate a 10-week janitorial training program in which individuals with disabilities work in

18   teams to provide janitorial services to local employers (including San Francisco's Department of

19   Aging and Adult Services).  And they operate Bakeworks Café as a non-profit "social enterprise"

20   where individuals with disabilities can receive short term training or long term jobs.

21       50.    Similarly, The Arc provides job training and placement plus ongoing coaching and

22   career development to individuals with intellectual and developmental disabilities.  *See* The Arc,

23   *Programs: Careers & Advancement*, http://www.thearcsf.org/what-we-do/programs/careers-

24   advancement.html (last visited July 27, 2018).  And PRC provides employment services to people

25   affected by HIV/AIDS, substance use, or mental health issues.  *See* PRC, *Employment Services*,

26   http://prcsf.org/employment-services/ (last visited July 27, 2018).

27   //

28   //

51.     The rescission of the Olmstead Guidance removes a valuable tool that San Francisco could—and previously has—used to ensure that these funding recipients continue to promote inclusion to the greatest extent possible.

52.     In short, the rescission of the *Olmstead* Guidance undercuts the efforts of MOD, OEWD, and San Francisco more broadly to ensure that its departments, programs, and contracting organizations are providing employment services that are fully integrated.

53.     Despite the importance of the *Olmstead* Guidance to state and local governments like San Francisco, Attorney General Sessions withdrew it without any meaningful explanation.

54.     On ADA.gov, DOJ provided the following explanation for the withdrawal of this critical document: "This action was taken to afford further discussion with relevant stakeholders, including public entities and the disability community, as to how best to provide technical assistance in this area." *Withdrawal of the Statement of the Department of Justice on Application of the Integration Mandate of Title II of the Americans with Disabilities Act and Olmstead v. L.C. to State and Local Governments' Employment Service Systems for Individuals with Disabilities*, DOJ Civil Rights Division (Dec. 21, 2017), https://www.ada.gov/withdrawn_olmstead.html.  This explanation, however, is entirely different from those given by Attorney General Sessions.  It does not indicate that DOJ determined the Statement was outdated, or unnecessary, or improper.  Rather, it introduces an entirely new rationale—that it was withdrawn to allow for further discussion and consideration of the principles addressed in the guidance.

55.     And elsewhere on ADA.gov, DOJ indicates that it withdrew the *Olmstead* Guidance because it was "*out-of-date, duplicative, or otherwise ineffective*" and its withdrawal would "make it easier for individuals with disabilities, covered entities, and the public to understand their rights and responsibilities under the ADA."  ADA.gov website, DOJ Civil Rights Division, https://www.ada.gov/ta_withdrawn.html (emphasis added).

56.     In fact, there is reason to believe that the withdrawal of this guidance reflects a *sub rosa* substantive shift in federal interpretation and enforcement of Title II's integration mandate.  Sheltered workshops are profitable enterprises, and a national trade association for sheltered workshops began lobbying DOJ's new political leadership to repeal the *Olmstead* Guidance in August 2017.  *See* David

M. Perry, *Companies That Exploit Disabled People Have a Friend in Jeff Sessions*, Pacific Standard (Jan. 3, 2018), https://psmag.com/economics/jeff-sessions-roll-back-disability-rights.  In light of this background as well as the fact that eighteen of the comments submitted in response to the request for input on the Department's regulatory reform agenda urged a withdrawal of the *Olmstead* Guidance and/or a change in the underlying substance, the repeal appears to indicate a meaningful shift in policy.

57.     Given the vague and contradictory explanations proffered by Defendants, San Francisco—along with other state and local governments and the public—is left without a clear understanding of the current state of the law and, therefore, whether it is compliant with the ADA. That not only makes it more difficult for San Francisco to continue to push its agencies and contractors toward fully integrated workplaces, but also increases the risk that San Francisco will face enforcement action by DOJ and lawsuits from the public.

58.     If DOJ were to determine that San Francisco is out of compliance with the integration mandate of the ADA, the City could be at risk of losing its WIOA and/or CDBG funds.

59.     And San Francisco has particular reason to be concerned about enforcement action by DOJ in this area given that DOJ has previously taken action against San Francisco over *Olmstead*-related violations.  In 2003, DOJ threatened a lawsuit against San Francisco over inadequate housing integration for residents of San Francisco's Laguna Honda Hospital ("LHH").  San Francisco and DOJ eventually reached a settlement to ensure residents were placed into the most integrated setting possible, which included DOJ monitoring of the facility until 2011.  *Settlement Agreement Between The United States Department of Justice and the City and County of San Francisco Regarding the Laguna Honda Hospital and Rehabilitation Center*, DOJ Civil Rights Division (June 13, 2008), https://www.ada.gov/olmstead/documents/laguna_settle.pdf.

60.     In addition, following the repeal of the *Olmstead* Guidance San Francisco may face increased resistance to fully integrated employment services and general accommodations for people with disabilities.  That resistance could harm San Francisco not only by leading to it becoming less accessible for its residents, but also by increasing the risk that San Francisco will face lawsuits over

1   whether it is providing sufficient accommodations for individuals with disabilities in its programs,

2   services, and facilities.

3   **B.   Statement On Ability Of Local Government To Exercise Control Over Group**
    **Living Arrangements For People With Disabilities.**

4

5   61.   Another one of the repealed documents was a joint statement by DOJ and the

6   Department of Housing and Urban Development concerning the Fair Housing Act's effect on the

7   ability of local governments to exercise control over group living arrangements, particularly for

8   persons with disabilities ("Joint Statement").  *See* Ex. C.

9   62.   Local governments—including San Francisco—have long regulated in this area.  *See,*

10  *e.g.*, San Francisco Planning Code §§ 102, 209.1, 209.3, 209.4, 210.2-.210.4, 713-719, 722-726.

11  63.   And as the Joint Statement itself indicates, there has been a "great deal of litigation"

12  concerning this issue, and DOJ has taken an active role in many of those cases.  *See* Ex. C at 1.

13  Indeed, several cities in California have been sued over determinations and regulations concerning

14  group living arrangements for individuals with disabilities that were alleged to violate the Fair

15  Housing Act.  *See, e.g.*, *Pacific Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142 (9th

16  Cir. 2013); *Gamble v. City of Escondido*, 104 F.3d 300 (9th Cir. 1997).

17  64.   Accordingly, the Joint Statement was a critical resource in providing direction to local

18  governments about what they could and could not do in compliance with federal law.  For instance, it

19  explained that local governments could generally restrict the ability of unrelated groups of people to

20  live together (subject to reasonable accommodations), but could not treat groups of unrelated persons

21  with disabilities less favorably than similar groups of unrelated persons without disabilities.

22  65.   In addition to relying on this document to aid in determining their course of conduct,

23  jurisdictions like San Francisco could also rely on the Joint Statement if and when those actions were

24  challenged in court.  Indeed, courts, too, relied on the Joint Statement in evaluating jurisdictions'

25  compliance with federal law.  *See, e.g.*, *Overlook Mut. Homes, Inc. v. Spencer*, 666 F. Supp. 2d 850,

26  856 (S.D. Ohio 2009); *Jeffrey O. v. City of Boca Raton*, 511 F. Supp. 2d 1339, 1354 n.10 & n.13 (S.D.

27  Fla. 2007).

28  //

66.    Defendants did not provide any particularized explanation for withdrawing this document.

67.    Through its own search, San Francisco was able to locate a later 2016 document that "updates and expands" upon the Joint Statement.  *See* Joint Statement of the Department of Housing and Urban Development and the Department of Justice: *State and Local Land Use Laws and Practices and the Application of the Fair Housing Act* (Nov. 10, 2016), https://www.justice.gov/opa/file/ 912366/download.  But there is material covered in the Joint Statement that does not appear to be included in the 2016 document, such as a discussion of the applicability of the anti-discrimination provisions of the Fair Housing Act to those claiming disability on the basis of having been adjudicated as a juvenile delinquent or for having a criminal record, or those who suffer from a current active addiction to illegal drugs.  *See* Ex. C at 1.

68.    In the absence of an explanation from Defendants for their decision to withdraw this document—*e.g.*, that they believe it has been completely supplanted by the 2016 document or that the Joint Statement was somehow incorrect or improper—there is no way for local governments to evaluate the validity of the justification or tailor their conduct accordingly.

**C.    Letters Concerning Standards For Assessing Citizenship Status Discrimination.**

69.    The Immigration and Nationality Act ("INA") generally prohibits employers—including local governments—from discriminating against individuals on the basis of national origin or, in the case of "protected individual[s]," on the basis of citizenship status.  8 U.S.C. § 1324b(1).

70.    San Francisco is an employer subject to Section 1324(b).  This section applies to "a person or other entity" (8 U.S.C. § 1324b(a)(1)), that employs more than three persons (*id.* § 1324b(a)(2)(a)).  San Francisco employs approximately 36,000 persons.

71.    San Francisco processes over 4,600 Employment Eligibility Verification forms (Form I-9) annually.  San Francisco relies on federal guidance in ensuring that it complies with the INA.

72.    The DOJ Immigrant and Employee Rights Section ("IER"), enforces the anti-discrimination provision of the INA.  8 U.S.C. § 1324b.  Before January 18, 2017, the IER was known as the Office of Special Counsel for Immigration-Related Unfair Employment Practices ("OSC").

//

73.     Two of the documents Defendants repealed without any explanation were OSC letters providing guidance about compliance with the anti-discrimination provisions of the INA.

74.     In one letter, DOJ explained that individuals who fail to apply for naturalization within six months of becoming eligible to do so were not "protected individuals" within the meaning of Section 1324b, but were nonetheless protected against other forms of discrimination, including document abuse (which it defined as "the request for more or different documents, or the rejection of reasonably genuine looking documents in the employment eligibility verification process based on national original or citizenship status"). *See* Ex. D.

75.     In the other letter, the Department provided its view on what employers were required to do to conduct citizenship documentation audits in compliance with the law. For example, DOJ explained that employers must complete internal audits of I-9 forms in the same manner for every employee and "may not scrutinize more closely the I-9 forms and documentation of select employees on the basis of national origin or citizenship status." Ex. E at 2. The letter also stated that employers cannot accept documentation that does not reasonably appear to be genuine or relate to that employee. *Id.*

76.     Defendants have not provided any explanation as to why these two letters in particular were selected for rescission. Dozens of other technical assistance letters addressing similar topics have not been rescinded.

77.     On July 3, 2018, DOJ rescinded a May 2011 guidance document titled "Refugees and Asylees Have the Right to Work." *See* Ex. I. This document provided critical guidance to employers such as San Francisco, including that "[r]efugees and asylees are authorized to work because of their status," and that refugees and asylees may experience a delay in receiving a social security number, but must be allowed to work once they have satisfied the I-9 documentation requirements. *Id.*

78.     Defendants have not provided any official explanation of why this document was rescinded.

79.     The rescinded documents assisted employers with INA compliance.

80.     Without an explanation for the rescission, employers lack critical information about the perceived deficiencies in the documents, and are more vulnerable to IER enforcement action and civil

penalties.  For instance, before the rescission an employer could have used reliance on the rescinded documents to assert a "good faith" affirmative defense against an IER action alleging document abuse and other discriminatory actions under 8 U.S.C. § 1324b.  After the rescission of the guidance without an explanation, employers are not only left more susceptible to a violation of DOJ's current interpretation of the INA, but would also be unable to assert a good faith defense based on reliance on these documents.

81.     Understanding why the guidance was rescinded is particularly important now for employers—including government employers like San Francisco—given the recent increase in Immigration and Customs Enforcement ("ICE") I-9 audits and enforcement actions.[8]  The acting ICE Director issued a directive to ICE agents in October 2017 to increase such worksite investigations by "four to five times."[9]  And ICE agents are following through on that directive, with more than twice as many workplace investigations opened in the first seven months of the 2018 fiscal year as in the entire previous one.[10]

82.     It is critically important for employers to understand DOJ's position on what is required of them in the hiring process.  Without knowing why Defendants rescinded these documents, employers like San Francisco are left to guess where DOJ stands on these timely and sensitive issues and face an increased risk of enforcement action.

**D.      Guidance Regarding Lawful And Equitable Imposition Of Fines and Fees.**

83.     When people are convicted of a crime, they are often charged thousands of dollars in fines, fees, or financial penalties related to their conviction, sentence, or incarceration.  But an unintended consequence of this practice is that it can push people into (or deeper into) poverty.  These fines, fees, and penalties can trap people in a cycle of debt, and low-income individuals and people of

---

[8] *See, e.g.*, Andrew Khouri, *Visits by federal immigration authorities are spooking California businesses and workers*, L.A. Times (Feb. 26, 2018), http://www.latimes.com/business/la-fi-immigration-workplace-20180226-story.html.

[9] *See* Tal Kopan, *ICE chief pledges quadrupling or more of workplace crackdowns*, CNN.com (Oct. 17, 2017), https://www.cnn.com/2017/10/17/politics/ice-crackdown-workplaces/index.html.

[10] *See ICE worksite enforcement investigations already double over last year,* ICE.gov (May 14, 2018), https://www.ice.gov/news/releases/ice-worksite-enforcement-investigations-already-double-over-last-year.

---

color are often hit the hardest.  Government thus becomes a driver of inequality, creating additional layers of punishment for those moving through the justice system.

84.     Two of the documents Defendants withdrew without any explanation were resources to help state and local governments address this problem by reforming their fines and fees practices to comply with the Constitution and federal law, to avoid perpetuating poverty, and to avert unnecessary deprivations of liberty and equal protection.

85.     One was a "Dear Colleague" letter issued as part of a package "meant to support the ongoing work of state judges, court administrators, policymakers and advocates in ensuring equal justice for all people, regardless of financial circumstance."  Press Release No. 16-285, DOJ Office of Public Affairs, *Justice Department Announces Resources to Assist State and Local Reform of Fine and Fee Practices* (March 14, 2016).  The letter provided guidance to state and local courts regarding their legal obligations with respect to the enforcement of fines and fees in court proceedings.  Specifically, it set forth seven requirements that had to be followed to be considered in compliance with the United States Constitution and/or other federal laws.  *See* Ex. F.

86.     The other was an advisory for recipients of financial assistance from DOJ on levying fines and fees on juveniles ("Juvenile Fines and Fees Advisory").  The stated intent of the advisory was to assist state and local juvenile probation departments, juvenile courts, and other juvenile justice agencies in ensuring that their imposition and enforcement of fines and fees did not violate the Constitution or the nondiscrimination provisions associated with the acceptance of federal financial assistance.  To that end, it set forth DOJ's understanding of the constitutional and statutory obligations related to collecting fines and fees from juveniles, summarized the enforcement actions available to DOJ in the event it discovered evidence of a violation, and offered recommendations to improve the administration of juvenile fines and fees.  *See* Ex. G.

87.     These guidance documents have formed the basis for widespread reform to stem unconstitutional practices.  They prompted numerous states to review their policies on fines and fees. The chair of Arkansas's Joint Committee, which was tasked with this review, noted, "The DOJ letter had a profound impact on every judge that read it.  For those judges that perceived these issues prior to the letter but were unable to generate enthusiasm for change, the letter provided a perfect platform for

review and modification of policies and procedures." U.S. Commission on Civil Rights, *Targeted Fines and Fees Against Low-Income Communities of Color: Civil Rights and Constitutional Implications* 51-52 (Sept. 2017). In Texas, the court system's administrative director remarked that the Dear Colleague Letter "was very helpful and very well received by the judges across the state." Chiraag Bains, *Sessions Says to Courts: Go Ahead, Jail People Because They're Poor*, N.Y. Times (Dec. 28, 2017), https://www.nytimes.com/2017/12/28/opinion/sessions-says-to-courts-go-ahead-jail-people-because-theyre-poor.html. In addition, the American Bar Association has explicitly endorsed the seven principles emphasized in these documents, while the Conference on State Court Administrators refers to the Dear Colleague Letter in its policy paper on ending debtors' prisons.

88.     Rescission of the fines and fee guidance in the "Dear Colleague" letter and the Juvenile Fines and Fees Advisory injures San Francisco in at least three ways.

89.     **First**, the rescission interjects uncertainty into the legal landscape and hinders San Francisco's ability to determine whether its own fines and fees practices are lawful, and what San Francisco must do to avoid DOJ enforcement activity. The "Dear Colleague" letter and the Juvenile Fines and Fees Advisory provided important guidance to San Francisco—and other local and state governments—about fines and fees. This guidance spurred increased review of San Francisco fines and fees, both within the City and in collaboration with the San Francisco Superior Court.

90.     In May 2016, San Francisco established a Municipal Fines and Fees Task Force to advise the Board of Supervisors, the Mayor, and City departments to assess and reform fines and fees that disproportionately burden low-income City residents. In November 2016, the San Francisco Treasurer launched a Financial Justice Project to assess and reform how fees and fines impact our city's most vulnerable residents. The Task Force published initial findings and recommendations in May 2017, and San Francisco enacted legislation to eliminate locally authorized criminal justice administrative fees in June 2018. Both San Francisco and the San Francisco Superior Court have also enacted a range of other fine and fee reforms.

91.     Yet local and state law continues to authorize—and in some cases, require—San Francisco to collect a variety of other fines and fees. For example, San Francisco's Adult Probation Department is led by a Chief Probation Officer who is appointed by and acts as an arm of the San

Francisco Superior Court.  The Adult Probation Department is authorized by state law to impose and collect a number of fines and fees.  San Francisco's Juvenile Probation Department receives federal funding, including, in recent years, funding from the United States Department of Justice Office of Justice Programs.  The Juvenile Probation Department is authorized by state law to impose and collect various fines.

92.     Before the rescission, DOJ and private plaintiffs relied on the fines and fees guidance documents in evaluating the conduct of local governments.  For example, DOJ used this guidance in reviewing whether Sacramento County's collection of juvenile justice fines and fees complied with applicable federal civil rights laws.  In another example, in a legal challenge to automatic license suspensions for failures to pay traffic fines and fees in Solano County, California, plaintiffs cited the letter's discussion of the unnecessary harms resulting from unfair fines and fees.  *See* Complaint at 8, *Rubicon Programs v. Superior Court of Cal. Cty. of Solano*, No. FCS047212 (Solano Super. Ct. June 15, 2016).

93.     Post-rescission, local governments face possible enforcement action even if their policies and practices comply with the rescinded guidance.  Defendants have offered no particularized explanation for the withdrawal of these documents.  Were they withdrawn because DOJ believed they were inconsistent with existing law?  Because DOJ decided that they improperly imposed new binding obligations on entities outside the executive branch?  Or because DOJ concluded they were outdated?  We do not know, but the difference is important, as each possible rationale for the repeal represents a different potential policy shift that is relevant for the activities of both the regulated community and for DOJ employees reviewing state and local governments' compliance with the law.

94.     **Second**, San Francisco suffers when residents are entrapped in the cycle of fines and fees.  Research has shown that fines and fees levied on people with modest incomes are often "lose-lose" for residents and for government.  When a low-income person cannot pay a fine or fee, other consequences follow.  The fine can increase with interest and late fees, a person's credit rating can be downgraded, and they may lose their driver's license and even their job.  This increases reliance on public benefits and public services, and these consequences follow people as they move from one jurisdiction to another.

95.     Fines and fees can also increase the likelihood of recidivism and create major barriers to reentry.  A study of probation fees in Maryland found that charging these administrative fees undercut reentry efforts, and that fee collection was at odds with the mission of their parole agency.  According to a report by the White House Council of Economic Advisers, high fine and fee payments may force indigent formerly incarcerated individuals to make difficult trade-offs between paying court debt and other necessary purchases.  The debt may even spur formerly incarcerated individuals to return to criminal activity to pay off their debts, according to the report.  These fees often hinder people's reentry and can push individuals into underground economies and the underground banking system.  A series of reports on similar fees charged in the juvenile justice system have found that the fees increase the likelihood of recidivism.

96.     San Francisco is thus impacted not only by its own fines and fees practices, but also by those of the courts, the State, and other jurisdictions.

97.     **Third**, in recognition of the harm that fines and fees can cause to individuals and the City, San Francisco provides funds to pay these fees in certain cases.  For example, unpaid fines and fees can be a significant barrier to employment.  To address this barrier, San Francisco's Human Services Agency provides funds to cover court fees, traffic tickets, and similar fines and fees, on a case by case basis.  Similarly, San Francisco's Adult Probation Department funds an employment program for at-risk transitional age youth who reside in high crime areas, and provides funds to mitigate traffic, DMV, and other fines for active participants who are demonstrating program successes.

98.     The rescission of the guidance documents makes it more likely that harmful, and possibly unlawful, fines and fee practices will continue or resume.

**E.     Technical Assistance Manual Concerning Disproportionate Minority Contact.**

99.     One of the twenty-four documents that Attorney General Sessions repealed in July 2018 was a manual that provided state and local agencies with assistance addressing the pervasive and challenging issue of over-representation of minority youth in the juvenile justice system ("Technical Assistance Manual").  *See* Ex. J.

//

100.     A core requirement for states that receive funding under the Juvenile Justice and Delinquency Prevention Act ("JJDPA") is to take steps to reduce disproportionate minority contact ("DMC") in the juvenile justice system.  States are required to determine the extent to which DMC exists in their system, assess the reasons why, and develop and implement intervention strategies to address these identified reasons for DMC.  *See Core Requirement of JJDP Act*, DOJ Office of Juvenile Justice and Delinquency Prevention, https://www.ojjdp.gov/dmc/about.html (last visited July 27, 2018).  The Technical Assistance Manual was a 389-page resource for states and localities that provided lessons, strategies, and best practices for reducing DMC in the juvenile justice system.  The Technical Assistance Manual noted "DMC reduction efforts need to occur at the local level and [the manual] illustrates ways local communities can prepare to undertake a multidisciplinary and collaborative approach in this area" (Ex. J at Intro-4), and focused specifically on strategies to take at the local level (*see, e.g.*, *id*. at Chapter 7).

101.     Across the country, juvenile justice systems are marked by disparate racial outcomes at every stage of the process, starting with more frequent arrests for youth of color and ending with more frequent secure placement.  Indeed, DOJ's Office of Juvenile Justice and Delinquency Prevention ("OJJDP") reports that disproportionate minority contact "is evident at nearly all contact points on the juvenile justice system continuum."   *In Focus: Disproportionate Minority Contact, Washington, DC: Office of Juvenile Justice and Delinquency Prevention* (2012), http://www.ojjdp.gov/pubs/239457.pdf.

102.     In the past decade, San Francisco has made great strides in this area.  For example, between 2008 and 2010, Black youth experienced nearly a 76% reduction in arrests, while Latino and Asian youth experienced a 67% and 84% reduction, respectively.  But the problem of disproportionate minority contact remains acute.  Although only 4-6% of the San Francisco community is Black, Black youth still represent 58% of juveniles in the custody of San Francisco's Juvenile Probation Department ("JPD").

103.     The rescission of the Technical Assistance Manual—which sets forth strategies and practices for addressing racial disparities—will make it harder for San Francisco to continue making progress in this critical area.  San Francisco intends to continue its efforts unabated, despite the repeal of this document.  But approximately 30% of the population served by JPD experience their first

juvenile justice contact in another county, before ultimately winding up in San Francisco's juvenile justice system.  Thus, other jurisdictions abandoning or scaling back their efforts to implement the practices set forth in the Technical Assistance Manual could directly and significantly impact disproportionate minority contact in San Francisco.  The resulting racial and ethnic disparities weaken the credibility of a justice system that is supposed to treat everyone equitably under the law.

104.    The withdrawal of the Technical Assistance Manual has been met with surprise and dismay from juvenile justice advocates.  The Campaign for Youth Justice, for example, stated the rescission of the Technical Assistance Manual without explanation left leaves agencies "directionless", and that "[s]tates need more and better guidance to refine and improve their strategies to reduce DMC and comply with JJDPA, not less."[11]  There is also some evidence that the rescission could reflect a substantive shift in OJJDP's interpretation of the JJDPA, given the new OJJDP Administrator has made multiple comments suggesting that the juvenile justice system should place more emphasis on "public safety and the victim."[12]  However, without an explanation for the rescission, state and local governments and advocates are unable to understand JJDPA's current obligations and the legality of any change in policy.

105.    In short, Attorney General Sessions' decision to repeal this document is surprising, concerning and—in the absence of any specific explanation—unlawful.

* * *

106.    All of these Documents were practically and legally significant.

107.    Practically, they helped to protect the civil rights of marginalized individuals across the country.  They reduced financial burdens on the poor and helped ensure equal access to justice.  They protected immigrants from discriminatory employment practices.  And they advanced the rights of people with disabilities to live and work in the most appropriate settings.

---

[11] *See* Matt Smith, Sessions' Withdrawal of Justice Department Manuals on DMC Leaves States 'Directionless', Juvenile Justice Information Exchange (July 11, 2018), https://jjie.org/2018/07/11/sessions-withdrawal-of-justice-department-manuals-on-dmc-leaves-states-directionless/; Campaign for Youth Justice, *Concerns Over Recent Actions by the Department of Justice and the Office of Juvenile Justice and Delinquency Prevention*, National Juvenile Justice Network (July 18, 2018), http://www.njjn.org/uploads/digital-library/CFYJ%20Backgrounder%20on%20Recent%20DOJ%20Actions%207.18.18.pdf.

[12] *Id.*

108.   Legally, they provided guidance to regulated entities.  Guidance letters describing DOJ's interpretation of the Constitution and/or federal laws carry an implicit threat that parties that do not follow their recommendations might face federal lawsuits or a loss of federal aid—and an implicit assurance that parties who *do* follow them will be safe from prosecution or administrative action.  The withdrawal of these documents eliminated those safe harbors.

109.   Moreover, based on Attorney General Sessions' statements (*see* ¶¶ 24–31, *supra*), it is apparent that at least some of the Documents were rescinded because Defendants believed they improperly imposed binding obligations on individuals and/or entities outside the executive branch.  In other words, according to DOJ, some of the Documents contained obligations that have now been removed.  Accordingly, legal consequences flow from this rescission.

110.   Without an explanation from Defendants about the rationale for the repeal of each of these documents, however, we are left to "guess at what theory underl[ies] the agency's action."  *Sec. & Exch. Comm'n v. Chenery Corp.*, 332 U.S. 194, 196–97 (1947) ("It will not do for a court to be compelled to guess at the theory underlying the agency's action; nor can a court be expected to chisel that which must be precise from what the agency has left vague and indecisive.").

111.   When the court "is left to guess as to the agency's findings or reasons," the agency's action "simply cannot be upheld."  *Time, Inc. v. U.S. Postal Serv.*, 685 F.2d 760, 773 (2d Cir. 1982) (quoting *Greater Boston Television Corp. v. F.C.C.*, 444 F.2d 841, 851 (D.C. Cir. 1970)).

**COUNT ONE:**
**AGENCY ACTION THAT IS ARBITRARY AND CAPRICIOUS**
**IN VIOLATION OF 5 U.S.C. § 706(2)(A)**

112.   The above paragraphs are incorporated herein by reference.

113.   DOJ is an agency subject to the requirements of the APA.  5 U.S.C. § 701(b)(1).

114.   Under 5 U.S.C. § 706(2)(A), courts shall hold unlawful and set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.

115.   The rescission of the Documents constitutes final agency action that is reviewable by this Court.

116.   The rescission of the Documents and actions taken by Defendants to rescind the eight guidance documents are arbitrary and capricious, an abuse of discretion, and not in accordance with

law because, among other things, Defendants failed to articulate a meaningful explanation for their actions.

117.    Under the APA, agencies must demonstrate that they engaged in reasoned decision-making when reaching a determination, and this includes policy changes made through repeals.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2120 (2016).  The agency's explanation for its decision must be clear enough that the agency's "path may reasonably be discerned." *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).  In the absence of any specific reasoning, "[i]t is not the role of the courts to speculate on reasons that might have supported an agency's decision," and the action must be deemed arbitrary and capricious. *Encino Motorcars*, 136 S. Ct. at 2127.

118.    This is particularly true where, as here, the rescinded policies engendered reliance interests.  *See Perez v. Mortg. Bankers Ass'n*, 135 S. Ct. 1199, 1209 (2015) ("[T]he APA requires an agency to provide more substantial justification when 'its new policy rests upon factual findings that contradict those which underlay its prior policy; or when its prior policy has engendered serious reliance interests that must be taken into account.  It would be arbitrary and capricious to ignore such matters.'"  *Id.* (quoting *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)).

119.    San Francisco and its residents were harmed and continue to be harmed by these unlawful acts.

## PRAYER FOR RELIEF

Wherefore, San Francisco prays that the Court grant the following relief:

1.    Vacate and set aside the rescission of the Documents and any action taken by Defendants to implement rescission of the Documents;

2.    Declare that the rescission of the Documents and actions taken by Defendants to rescind the Documents are void and without legal force or effect;

3.    Declare that the rescission of the Documents and actions taken by Defendants to rescind the Documents are arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law in violation of 5 U.S.C. § 706;

//

1    4.    Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all

2  persons in active concert or participation with any of them, from implementing or enforcing the

3  rescission of the Documents and from taking any other action to rescind the Documents that is not in

4  compliance with applicable law;

5    5.    Award San Francisco reasonable costs and attorneys' fees; and

6    6.    Grant any other further relief that the Court deems fit and proper.

7

8  Dated:  July 30, 2018              DENNIS J. HERRERA
                                      City Attorney
9                                     JESSE C. SMITH
                                      RONALD P. FLYNN
10                                    YVONNE R. MERÉ
                                      MOLLIE M. LEE
11                                    SARA J. EISENBERG
12
                                      Deputy City Attorneys
13

14                                 By: */s/ Dennis J. Herrera*
15                                    DENNIS J. HERRERA
                                      City Attorney
16
                                      Attorneys for Plaintiff
17                                    CITY AND COUNTY OF SAN FRANCISCO

18

19

20

21

22

23

24

25

26

27

28