UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CITY AND COUNTY OF SAN FRANCISCO, | Case No. 18-cv-02068-JST |
| Plaintiff, | **ORDER GRANTING MOTION TO DISMISS** |
| v. | Re: ECF No. 36 |
| MATTHEW G. WHITAKER, et al., | |
| Defendants. | |

Before the Court is Defendants Department of Justice and Acting Attorney General Matthew Whitaker's (collectively, "DOJ") motion to dismiss Plaintiff City and County of San Francisco's (the "City") complaint. ECF No. 36. The Court will grant the motion.

## I. BACKGROUND

### A. Facts

In February 2017, President Donald Trump issued Executive Order 13777, "Enforcing the Regulatory Reform Agenda," which, among other things, instructed executive agencies to identify regulatory actions that were "outdated, unnecessary, or ineffective" as candidates for repeal, modification, or replacement. 82 Fed. Reg. 12,285, 12,286 (Feb. 24, 2017). In November 2017, then-Attorney General Jefferson Sessions issued a memorandum addressed specifically at DOJ guidance documents, in which he observed that DOJ had "in the past published guidance documents – or similar instruments of future effect by other names, such as letters to regulated entities – that effectively bind private parties without undergoing the rulemaking process." Attorney General Memorandum, *Prohibition on Improper Guidance Documents*, at 1 (Nov. 16, 2017), https://www.justice.gov/opa/press-release/file/1012271/download. The memorandum instructed DOJ to refrain from this practice in the future, stating that the agency would no longer

"issue guidance documents that purport to create rights or obligations binding on persons or entities outside the Executive Branch (including state, local, and tribal governments)," and setting forth several principles for future guidance documents. *Id.* at 1-2. In addition, the memorandum instructed the agency "to identify existing guidance documents that should be repealed, replaced, or modified in light of these principles." *Id.* at 2.

Pursuant to EO 13777 and the November 2017 Attorney General Memorandum, DOJ announced in December 2017 that it was rescinding twenty-five guidance documents that it had identified as "unnecessary, inconsistent with existing law, or otherwise improper." ECF No. 30-1 at 2. In July 2018, DOJ rescinded an additional twenty-four guidance documents that it had determined "were unnecessary, outdated, inconsistent with existing law, or otherwise improper." ECF No. 30-8 at 2.

This dispute arises from the rescission of eight of these guidance documents. First, the "*Olmstead* Guidance"[1] provided guidance to state and local governments on implementing Title II of the Americans with Disabilities Act's ("ADA") mandate to provide integrated workplace settings to employees with disabilities. *See* FAC ¶¶ 37-60; ECF No. 30-2. Second, DOJ and the Department of Housing and Urban Development's "1999 Joint Statement" explained the agencies' view on how the Fair Housing Act ("FHA") impacted local government control over group living arrangements. *See* FAC ¶¶ 61-68; ECF No. 30-3.

The next set of guidance documents concerned provisions of the Immigration and Nationality Act ("INA") that prohibit employment discrimination on the basis of national origin, or in the case of certain "protected individuals," citizenship status (collectively, the "INA Guidance"). *See* FAC ¶ 69. The third challenged document, the "Zendejas Letter," set forth DOJ's interpretation of when individuals are "protected individuals" and various protections that apply. *See id.* ¶ 74; ECF No. 30-4. Fourth, the "Baudry Letter" provided guidelines for employers to conduct citizenship documentation audits in compliance with the INA's non-discrimination provisions. *See* FAC ¶ 75; ECF No. 30-5. Fifth, a DOJ guidance document,

---

[1] This guidance relates to the application of the Supreme Court's decision in *Olmstead v. L.C. ex rel. Zimring*, 522 U.S. 581 (1999).

"Refugees and Asylees Have the Right to Work" (the "Refugee Employment Flyer"), provided additional guidance regarding employing those individuals.  *See* FAC ¶ 77; ECF No. 30-9.

Two more guidance documents concerned the imposition of fees and fines in the criminal justice system.  The sixth challenged document, the "Dear Colleague" letter, provided guidance to state and local court entities on constitutional and federal statutory issues raised by various fee and fine practices.  *See* FAC ¶ 85; ECF No. 30-6.  Seventh, the "Juvenile Fines and Fees Advisory" for recipients of DOJ financial assistance addressed similar concerns as applied to the juvenile justice system.  *See* FAC ¶ 86; ECF No. 30-7.

Finally, the "Technical Assistance Manual" provided guidance to state and local agencies on addressing the over-representation of minority youth in the juvenile justice system.  *See* FAC ¶ 99; ECF No. 30-10.

The City alleges, and DOJ does not dispute, that the agency provided no explanation for withdrawing these guidance documents beyond the statements in DOJ's general rescission announcements.  FAC ¶ 32-36.

**B.      Procedural History**

On April 5, 2018, the City filed this lawsuit, alleging that DOJ had failed to provide a meaningful and particularized explanation for the December 2017 decision to rescind six of the guidance documents, making its action arbitrary and capricious, in violation of the Administrative Procedure Act ("APA"), 5 U.S.C. § 706(2)(A).  ECF No. 1.  On June 18, 2018, DOJ filed a motion under Federal Rule of Civil Procedure 12(b)(1) to dismiss for lack of jurisdiction, asserting that the City lacked standing, the City's claims were unripe, and the rescissions of certain of the documents were not final agency actions subject to APA review.  ECF No. 18.

On July 30, 2018, the City amended its complaint to include additional allegations related to its standing, as well as to include within its APA challenge two more guidance documents rescinded in early July 2018.  *See* FAC.  On September 27, 2018, DOJ filed an amended motion to dismiss, raising the same jurisdictional attacks.  ECF No. 36.  This motion is now before the Court.

3

## II.    JURISDICTION

The Court has jurisdiction pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 702.  Though DOJ challenges the City's standing, the Court has jurisdiction to determine its own jurisdiction.  *See Special Invs., Inc. v. Aero Air, Inc.*, 360 F.3d 989, 992 (9th Cir. 2004).

## III.   LEGAL STANDARD

If a plaintiff lacks Article III standing to bring a suit, the federal court lacks subject matter jurisdiction and the suit must be dismissed under Rule 12(b)(1).  *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004).  "A Rule 12(b)(1) jurisdictional attack may be facial or factual. In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.  By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction."  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (citation omitted).  Where, as here, the defendant makes a facial attack, the court assumes that the complaint's allegations are true and draws all reasonable inferences in the plaintiff's favor.  *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).[2]

## IV.    DISCUSSION

### A.    Article III Standing

#### 1.    Legal Standard

Article III standing requires that a "plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 136 S.Ct. 1540, 1547, 194 L.Ed.2d 635 (2016).  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Id.* at 1548 (quoting *Lujan v. Defs. of Wildlife*, 504

---

[2] The parties also rely on copies of the rescinded guidance documents attached to the City's FAC, *see, e.g.*, ECF No. 30-1, as well as copies of current guidance documents attached to DOJ's motion to dismiss, *see* ECF Nos. 36-6, 36-7, 36-8, 36-10.  Because the parties dispute neither the factual content of these publicly available government records nor their authenticity, the Court concludes that DOJ's attack is nonetheless facial.  Moreover, the Court may properly consider such materials here.  *See Hyatt v. Yee*, 871 F.3d 1067, 1071 n.15 (9th Cir. 2017).

4

U.S. 555, 560 (1992)).

Because "[t]he party invoking federal jurisdiction bears the burden of establishing these elements," they are "an indispensable part of the plaintiff's case." *Lujan*, 504 U.S. at 561. Accordingly, "each element must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation." *Id.* at 561.

"[A] plaintiff must demonstrate standing for each claim he seeks to press and for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017) (citation omitted).

### 2.    Common Standing Issues

The Court first addresses issues common to the standing analysis for all of the guidance documents, then turns to the City's specific theories for each one.

### a.    Procedural Standing

As an initial matter, the City contends that it is subject to the less rigorous standing inquiry that applies when a plaintiff alleges a procedural violation. ECF No. 38 at 11-12.

"In order to establish an injury in fact in the context of a claimed procedural error in an agency's decisionmaking process, a plaintiff must show that '(1) the [agency] violated certain procedural rules; (2) these rules protect [a plaintiff's] concrete interests; and (3) it is reasonably probable that the challenged action will threaten their concrete interests.'" *Friends of Santa Clara River v. U.S. Army Corps of Eng'rs*, 887 F.3d 906, 918 (9th Cir. 2018) (quoting *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1232 (9th Cir. 2017) (alterations in original)).

The Court first considers whether the City alleges a violation of procedural rules. As set forth in its operative complaint, the City alleges that DOJ's rescission of the guidance documents violated the APA because it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A); *see also* FAC ¶¶ 113-116. Specifically, the City contends that DOJ failed to provide "a reasoned explanation" for its decision. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016); *see also* FAC ¶¶ 117-118.

DOJ argues that § 706(2)(A) does not create a procedural right. ECF No. 39 at 8. DOJ

observes that the City's challenge is not based on a claimed violation of the APA's notice-and-comment procedures, *see* 5 U.S.C. § 553, or procedural requirements set forth in a separate statute, *see, e.g.*, *Friends of Santa Clara River*, 887 F.3d at 918-19 (allegedly inadequate environmental analysis under the National Environmental Policy Act and Endangered Species Act). Nor, as DOJ points out, has the City identified any case holding that a § 706(2)(A) challenge falls within the procedural standing framework.

Two cases do indirectly support the City's position. First, in *Massachusetts v. EPA*, the Supreme Court explained that Massachusetts was asserting its "procedural right to challenge the rejection of its rulemaking petition [under the Clean Air Act] as arbitrary and capricious." 549 U.S. 497, 520 (2007). Notably, the Clean Air Act provision in question empowered a reviewing court to reverse agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" – the exact language found in the APA. *Compare* 42 U.S.C. § 7607(d)(9)(A), *with* 5 U.S.C. § 706(2)(A). The Supreme Court went on to conclude that the agency's decision was arbitrary and capricious because it "offered no reasoned explanation for its refusal to decide" the key question presented by the rulemaking petition. *Massachusetts*, 549 U.S. at 520. Second, in *Encino Motorcars*, the Supreme Court reiterated that "[o]ne of the basic *procedural* requirements of administrative rulemaking is that an agency must give adequate reasons for its decisions." 136 S. Ct. at 2125 (emphasis added). Citing 5 U.S.C. § 706(2)(A), the Supreme Court explained that "where the agency has failed to provide even that minimal level of analysis, its action is arbitrary and capricious and so cannot carry the force of law." *Id.*

In sum, *Massachusetts* holds that a statutory provision providing for judicial review under the exact standard contained in § 706(2)(A) can create a procedural right. And *Encino Motorcars* reaffirms, albeit in a different context, the procedural nature of the Supreme Court's longstanding interpretation of § 706(2)(A) as imposing a requirement that agencies give a reasoned basis for their decisions. These cases suggest that, at least where plaintiffs allege that an agency's action is arbitrary and capricious under § 706(2)(A) *because* of the agency's failure to follow the "basic procedural requirement[]" of providing any reasoned explanation whatsoever, *Encino Motorcars*, 136 S. Ct. at 2125, a procedural standing analysis is appropriate.

1   DOJ's arguments to the contrary are unpersuasive. DOJ's concerns that this conclusion

2   would transfer the APA into "an omnipresent 'citizen-suit' statute," ECF No. 39 at 8, ignore that a

3   plaintiff must still establish a concrete interest threatened by the agency action, *Friends of Santa*

4   *Clara River*, 887 F.3d at 918; *see also Summers v. Earth Island Institute*, 555 U.S. 488, 496

5   (2009) ("[D]eprivation of a procedural right without some concrete interest that is affected by the

6   deprivation – a procedural right in vacuo – is insufficient to create Article III standing."); *Lujan*,

7   504 U.S. at 571-73 (concluding that plaintiffs could not rely on a procedural right without

8   identifying a concrete interest at stake). And contrary to DOJ's suggestion, ECF No. 39 at 8,

9   procedural rights are not limited to notice-and-comment procedures, but have been regularly found

10  to include an agency's statutory obligations to conduct certain analyses and provide the results to

11  the public to explain its decision. *See, e.g.*, *W. Watersheds Project v. Kraayenbrink*, 632 F.3d 472,

12  485, 494-95 (9th Cir. 2011) (applying procedural standing analysis to claims that agency failed to

13  take "hard look" at action's impacts or supply "reasoned explanation"). DOJ's argument that

14  procedural requirements are "[g]enerally contained in a separate statute," ECF No. 39 at 7, does

15  not provide a principled distinction, given that the APA also contains notice-and-comment

16  requirements that are considered procedural rights for the standing inquiry, *see Sugar Cane*

17  *Growers Co-op. of Fla. v. Veneman*, 289 F.3d 89, 95 (D.C. Cir. 2002) (discussing procedural

18  standing based on 5 U.S.C. § 553). Perhaps the better distinction might be that § 553 explicitly

19  imposes a procedural requirement, while § 706(2)(A) contains only an implicit requirement of a

20  reasoned explanation. But this distinction also cannot stand in light of the *Massachusetts* Court's

21  holding that a judicial review provision coupled with the same language creates a procedural right.

22  Nonetheless, the Court need not decide the issue because, as explained below, the City

23  lacks standing under even the more lenient procedural standing approach. For the same reason,

24  the Court likewise assumes without deciding that any procedural component of § 706(2)(A)

25  protects the City's concrete interests. *See Friends of Santa Clara River*, 887 F.3d at 918.

26  The Court reserves consideration of the third requirement of injury under procedural

27  standing – whether it is "reasonably probable that the challenged action will threaten [the City's]

28  concrete interests," *id.* (citation omitted) – for its analysis of the City's standing theories for each

7

guidance document.  Under the "reasonably probable" standard, the "the imminence inquiry is 'less demanding.'" *Navajo Nation v. Dep't of Interior*, 876 F.3d 1144, 1161 (9th Cir. 2017) (quoting *Hall v. Norton*, 266 F.3d 969, 976 (9th Cir. 2001)).  Accordingly, "[t]he challenged action need not immediately or directly cause the harm as a first-order effect."  *Id.* (citation omitted).  Nonetheless, while "a contingent 'chain of events' can create a 'reasonably probable' threat to a plaintiff's interests, a purely speculative sequence of occurrences will not meet this standard."  *Id.* (quoting *Bell v. Bonneville Power Admin.*, 340 F.3d 945, 951 (9th Cir. 2003)).

Finally, if the City establishes an "an injury in fact in the context of a claimed procedural error," it need not satisfy the normal standards for causation and redressability, but need show only that "the relief requested – that the agency follow the correct procedures – may influence the agency's ultimate decision."  *Friends of Santa Clara River*, 887 F.3d at 918 (citation omitted).

### b.  Special Solicitude

The City next asserts as a threshold matter that, as a municipality, it is entitled to "special solicitude" in the standing analysis.  ECF No. 38 at 11-12.

In *Massachusetts*, the Supreme Court explained that "States are not normal litigants for the purposes of invoking federal jurisdiction." 549 U.S. at 519.  In considering whether Massachusetts had suffered an Article III injury from the EPA's alleged failure to regulate greenhouse gases, the Supreme Court stressed that Massachusetts had "surrender[ed] certain sovereign prerogatives" that would have provided other means of addressing the problem, such as forcefully compelling reductions in neighboring states, negotiating treaties with other sovereign nations, or enacting its own regulations (that might run afoul of preemption).  *Id.*  This special solicitude was thus based on the state's quasi-sovereign interests.  *See id.* (first citing *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) (involving a "suit by a state for an injury to it in its capacity of quasi-sovereign"); then citing *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 607 (1982) (discussing the requirement of a "quasi-sovereign interest" in order to bring a *parens patriae* action)).

The Ninth Circuit has explained, however, that municipalities' "power is derivative and not sovereign," and therefore they cannot claim the same treatment as states, such as the ability to

sue as *parens patriae* on behalf of their citizens. *City of Sausalito v. O'Neill*, 386 F.3d 1186, 1197 (9th Cir. 2004) (quoting *Colo. River Indian Tribes v. Town of Parker*, 776 F.2d 846, 848 (9th Cir. 1985)). Rather than asserting a quasi-sovereign interest, a municipality may "sue to protect its own 'proprietary interests' that might be 'congruent' with those of its citizens." *Id.* (quoting *Colo. River Indian Tribes*, 776 F.2d at 848); *see also Alfred L. Snapp*, 458 U.S. at 600-02 (distinguishing between quasi-sovereign and proprietary interests). Nonetheless, the range of a municipality's cognizable proprietary interests is "not confined to protection of its real and personal property," but extends broadly to interests "as varied as a municipality's responsibilities, powers, and assets." *City of Sausalito*, 386 F.3d at 1197.

The City provides no authority suggesting that "special solicitude" applies to municipalities in the standing inquiry. The Eighth Circuit case that the City cites, *Iowa League of Cities v. EPA*, found that the plaintiff cities had standing as "regulated entities," without any discussion of special treatment for municipalities. 711 F.3d 844, 871 (8th Cir. 2013). The City's remaining cases are inapposite because they involve states as plaintiffs. *See* ECF No. 38 at 12.

The Court therefore concludes that no special solicitude applies to the City.

### c. Organizational Standing

The City also raises an independent theory of organizational standing for some of the guidance documents, relying on *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982). ECF No. 38 at 19-20. As explained by the Ninth Circuit, an organization may establish injury under *Havens* where "a challenged statute or policy frustrates the organization's goals and requires the organization to expend resources in representing clients they otherwise would spend in other ways." *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936, 943 (9th Cir. 2011) (en banc) (citation omitted). As the City's opposition makes clear, the diversion of resources that it alleges is the same as the economic harms it asserts as an independent theory of standing. ECF No. 38 at 19. Given this overlap, the Court sees no need to address the City's organizational standing separately. Put differently, a municipality's ability to claim proprietary interests to the full extent of its "responsibilities, powers, and assets" appears to amply cover the goals that could properly constitute the City's organizational mission. *City of Sausalito*, 386 F.3d

9

at 1197. And if the alleged diversion of resources is also argued as an economic injury, an independent analysis of organizational standing would be duplicative.[3]

Accordingly, the Court concludes that the City's organizational standing theory will rise or fall with its other arguments.

### d. Regulatory Uncertainty

Finally, the Court notes that all of the City's theories of standing are premised to some extent on the regulatory uncertainty alleged to result from DOJ's rescission of the guidance documents. To the extent the City seeks to rely on regulatory uncertainty alone as a threat to its concrete interest, the Court finds that theory unavailing.

The Ninth Circuit has rejected the "broad" proposition that "the object of a regulation is presumed to have standing." *Cal. Sea Urchin Comm'n v. Bean*, 883 F.3d 1173, 1181 (9th Cir. 2018). Rather, a regulated entity suffers cognizable injury when the agency's action "imposes concrete and particular burdensome requirements on a party," such as requiring a "particular change in the . . . industry's practices" or a "specific cost that [plaintiffs] must bear because of the increased risk of liability." *Id.* As multiple courts have recognized, regulatory uncertainty alone does not meet this standard. *See Nat'l Family Planning & Reprod. Health Ass'n, Inc. v. Gonzales*, 468 F.3d 826, 831 (D.C. Cir. 2006) (emphasizing that regulated association had not suffered cognizable injury where it had "within its grasp an easy means for alleviating the alleged uncertainty" by petitioning the agency to adopt a clarifying rule); *cf. Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 811 (2003) (rejecting argument that "mere uncertainty as to the validity of a legal rule constitutes a hardship for purposes of the ripeness analysis"); *Nat. Res. Def. Council v. Abraham*, 388 F.3d 701, 706 (9th Cir. 2004) (same). The Eighth Circuit's *Iowa League of Cities* decision, which involved the adoption of binding policies that dictated the regulated

---

[3] Government entities and private organizations are not necessarily interchangeable for standing purposes, and therefore it is unclear that a *Havens* analysis is even appropriate here. For instance, an organization "has standing to bring suit on behalf of its members" under certain conditions. *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). By contrast, a municipality such as the City "may not simply assert the particularized injuries to the 'concrete interests' of its citizens on their behalf," but rather "may sue to protect its own 'proprietary interests' that might be 'congruent' with those of its citizens." *City of Sausalito*, 386 F.3d at 1197.

10

cities' conduct, is not to the contrary.  711 F.3d at 864-65, 871.

Accordingly, the City must adequately plead some additional harm to satisfy Article III.

### 3.    Specific Guidance Standing Issues

The Court next turns to the City's standing theories for the rescission of each of the eight guidance documents.

### a.    *Olmstead* Guidance

The City contends that the rescission of the *Olmstead* Guidance on the ADA threatens to impair its concrete interests by (1) interfering with the City's enforcement of the law, (2) increasing the risk of enforcement actions against the City, and (3) threatening a loss of funding. ECF No. 38 at 32.

### i.    Enforcement of Laws

First, the City argues that it has suffered an injury to its interests in enacting laws and administering programs.  ECF No. 38 at 13-14.  The City reasons that the rescission of the *Olmstead* Guidance "undercuts the City's ability to comply with the ADA" and to ensure that its contractors do so as well.  *Id.* at 14 (citing FAC ¶ 52).

A municipality may sue to redress "injury to its ability to function as a municipality in regulating persons and property within its jurisdictional control."  *Colo. River Indian Tribes v. Town of Parker*, 776 F.2d at 848; *cf. Scotts Valley Band of Pomo Indians of Sugar Bowl Rancheria v. United States*, 921 F.2d 924, 927 (9th Cir. 1990) (recognizing a protectable "municipal interest in taxing and regulatory powers" for intervention as of right).[4]  But in order to show that such an injury actually exists, the municipality or state must identify some "actual conflict" between the federal action and its ability to regulate.  *Sturgeon v. Masica*, 768 F.3d 1066, 1074 (9th Cir. 2014) ("Because Alaska did not identify any actual conflict between [the federal agency's] regulations and its own statutes and regulations, we are left with only a vague idea of

---

[4] As noted above, there is little to suggest that municipalities possess any "quasi-sovereign" interests, even in enforcing their laws.  *See City of Sausalito*, 386 F.3d at 1197; *but see County of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 525 (N.D. Cal. 2017).  The Court need not decide the issue because a municipality possesses a similarly cognizable "proprietary" interest.  *See City of Sausalito*, 386 F.3d at 1197-98.

how exactly [the agency's] permitting requirement infringes on the state's sovereign and proprietary interests in its lands and waters, or how the requirement interferes with the state's control over and management of those lands and waters.  In the absence of such a conflict, Alaska's purported injuries are too 'conjectural or hypothetical' to constitute injuries-in-fact."), *vacated on other grounds and remanded sub nom. Sturgeon v. Frost*, 136 S. Ct. 1061 (2016); *see also Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 269 (4th Cir. 2011) (noting that the state had "not identified any plausible, much less imminent, enforcement of the [state law] that might conflict with the [federal requirement]").  In the absence of an actual conflict, courts have also found a cognizable interference where the federal action creates an "intrusion . . . analogous to pressure to change state [or local] law." *Texas v. United States*, 809 F.3d 134, 153 (5th Cir. 2015); *see also County of Santa Clara*, 250 F. Supp. 3d at 526 (finding injury where executive orders "attempt[ed] to compel [Counties] to change their policies and enforce the Federal government's immigration laws in violation of the Tenth Amendment").

Here, the City does not identify any of its own laws or regulations that are at risk of conflicting with the ADA in the absence of the *Olmstead* Guidance.  Rather, the City relies solely on its need to comply with the ADA.  ECF No. 38 at 14.  The City's efforts to comply with the ADA are not an exercise of its proprietary interest in regulating its citizens, but rather a fulfillment of its obligations as a regulated entity.  *See* 42 U.S.C. § 12131(1)(A).  The City provides no authority to the contrary, and its citation to *Iowa League of Cities*, merely confirms that the City operates as a "regulated entit[y]" in this context.  711 F.3d at 869.

Because the City does not allege an interference with its proprietary interest in regulating within its jurisdiction, the Court rejects this theory of injury.

### ii.     Threat of Enforcement

Next, the City argues that it has alleged a threat to its concrete interests based on the risk that the City will violate the ADA in absence of the withdrawn guidance and that DOJ will bring an enforcement action based on that violation.  ECF No. 38 at 17-19.

"[T]o show a concrete and particularized harm a plaintiff must do more than allege a potential risk of prosecution." *Cal. Sea Urchin Comm'n*, 883 F.3d at 1180.  To evaluate whether

there exists a "genuine" risk of prosecution sufficient to establish an imminent injury, "courts considers three factors: (1) whether the plaintiffs have articulated a concrete plan to violate the law in question, (2) whether the prosecuting authorities have communicated a specific warning or threat to initiate proceedings, and (3) the history of past prosecution or enforcement under the challenged statute." *Id.* (internal quotation marks and citation omitted); *see also Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000) (en banc) (same).[5]

The City argues that this test has been abrogated by the Supreme Court's statement that "a plaintiff satisfies the injury-in-fact requirement where he alleges 'an intention to engage in a course of conduct arguably affected with a constitutional interest, but proscribed by a statute, and there exists a credible threat of prosecution thereunder.'" *Susan B. Anthony List v. Driehaus* *("SBA")*, 134 S. Ct. 2334, 2342 (2014) (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)). The Court disagrees. The Ninth Circuit has continued to apply the three *Thomas* factors after *SBA*. *See, e.g.*, *Clark v. City of Seattle*, 899 F.3d 802, 813 (9th Cir. 2018); *Cal. Sea Urchin Comm'n*, 883 F.3d at 1180. Because the City cites no "intervening higher authority" since those more recent Ninth Circuit cases, there is no basis for the Court to depart from that binding precedent. *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc). Further, the Court is doubtful that the minimal differences between those formulations are the type that render a case "clearly irreconcilable with the reasoning or theory of" a subsequent case. *Id.*

Turning to the *Thomas* factors, the City's theory falters at the first step. In finding pre-enforcement challenges justiciable, courts have required plaintiffs to identify particular conduct that may spur such enforcement. In *SBA*, for instance, the plaintiffs "pleaded specific statements they intend[ed] to make in future election cycles," and the history of prior prosecution of similar statements as false meant that the plaintiffs' future actions were likely to come into conflict with the challenged law. 134 S. Ct. at 2343. And in *Thomas*, even though the plaintiffs alleged that they had previously violated the challenged law by refusing to rent housing to unmarried couples

---

[5] As the Ninth Circuit has explained, the likelihood of future prosecution may be characterized as a question of Article III standing or constitutional ripeness. *Thomas*, 220 F.3d at 1138; *see also City & County of San Francisco v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018) (applying *Thomas* factors to ripeness inquiry).

and "pledge[d] their intent to do so in the future," the Ninth Circuit found these allegations inadequate because the plaintiffs did not "specify when, to whom, where, or under what circumstances." 220 F.3d at 1139. The Ninth Circuit explained that "[a] general intent to violate a statute at some unknown date in the future does not rise to the level of an articulated, concrete plan." *Id.* Finally, in *County of Santa Clara*, on which the City also relies, the Counties had in place policies that were arguably proscribed by the challenged executive order. 250 F. Supp. 3d at 521.

Here, the City has no "plan" to violate the ADA – quite the opposite. The City alleges that it fully intends to *comply* with the law, and it counts such compliance among its core missions. *See* ECF No. 38 at 19. Nor does the City cite specific conduct that it believes is lawful but is at least "arguably . . . proscribed by [the] statute[s]" in question. *SBA*, 134 S. Ct. at 2344 (first and second alterations in original) (citation omitted). Rather, the City's theory is that reduced clarity regarding the law increases the likelihood that the City will make a hypothetical future misstep that violates the ADA without the benefit of "safe harbors" provided by the guidance documents. ECF No. 38 at 18. The City cites no case suggesting that this kind of generalized risk can form the foundation of a pre-enforcement challenge, and such a theory is not meaningfully different from relying on regulatory uncertainty alone.

The Ninth Circuit's decision in *California Sea Urchin Commission* is on point. There, plaintiff fishermen alleged that they "face[d] an increased risk of liability because of the elimination of exemptions for incidental takes" that harmed a protected species in a fishing area. 883 F.3d at 1180. The Ninth Circuit reasoned that the risk of liability absent the exemption created no more than "a potential risk of prosecution," and that the plaintiffs' declarations did "not point to any concrete degree of risk, or show that liability is likely." *Id.* at 1180-81.

Considering the second *Thomas* factor only reinforces the Court's conclusion that the City's theory is fatally flawed. Because the City has no plans to violate the ADA, it is unsurprising that there has been "no specific warning or threat to initiate proceedings." *Thomas*, 220 F.3d at 1139; *see also id.* at 1140 ("The threat of enforcement based on a future violation – which may never occur – is beyond speculation."). Finally, without such concrete details, the

1    third *Thomas* factor carries little weight.  The Court cannot assign probative value to a single prior

2    enforcement action against the City for not complying with *Olmstead* requirements without any

3    indication that the City intends to engage in similar conduct.[6]  Even under the "less demanding"

4    reasonably probable standard for imminence, the City's theory fails.  *Navajo Nation*, 876 F.3d at

5    1161 (citation omitted).

6           The Court therefore concludes that the City has not adequately alleged injury based on the

7    risk of prosecution.

8                                   **iii.     Economic Harm**

9           The City's final theory is that it will suffer economic harm because if it violates

10   *Olmstead*'s integration mandate, it could be at risk of losing federal grants that help support the

11   City's programs related to the employment of disabled individuals.  ECF No. 38 at 15 (citing FAC

12   ¶¶ 48, 58).  Because the City has not adequately alleged a likelihood of enforcement based on

13   hypothetical ADA violations, any loss of funds premised on such violations is also too

14   speculative.  *Cf. County of Santa Clara*, 250 F. Supp. 3d at 524-26 (loss of funds sufficiently

15   imminent where plaintiffs demonstrated credible threat of enforcement).

16          In sum, the Court holds that the City has not shown that it reasonably probable that the

17   rescission of the *Olmstead* Guidance threatens its concrete interests.

18                                   **b.     Joint Statement**

19          The City alleges that rescission of the 1999 Joint Statement on FHA requirements impairs

20   its concrete interests by (1) interfering with its municipal interest in regulation and (2) increasing

21   the risk of enforcement actions.  ECF No. 38 at 32.

22          The Court addresses as a threshold matter DOJ's argument that the City cannot show any

23   concrete harm because a substantively identical 2016 Joint Statement is still in effect.  ECF No. 36

24   at 28.  The 1999 Joint Statement and the 2016 Joint Statement do appear to contain similar

25   information.  *Compare, e.g.*, ECF No. 30-3 at 4-5 ("What is a reasonable accommodation under

26

27   ───────────────────────────
     [6] The City also does not contest DOJ's argument that this enforcement action was based on

28   *Olmstead* requirements regarding the integration of hospital residents rather than the employment
     settings addressed in the rescinded *Olmstead* Guidance.  ECF No. 36 at 18; FAC ¶ 59.

the Fair Housing Act?"), *with* ECF No. 36-10 at 9-10 ("What is a reasonable accommodation under the Fair Housing Act?"). Moreover, the City's opposition does not argue that there are material differences between the two documents that would contribute to the City's alleged injuries.[7]

The premise underlying the City's theories of injury is that the rescission of the 1999 Joint Statement created a vacuum in agency guidance that made it more difficult for the City to determine the FHA's restrictions on local land use regulation. *See* ECF No. 38 at 14, 32. If there is no such vacuum, then there is no reason to think that the rescission made it any more difficult for the City to comply with the FHA.

Though not directly on point, the Ninth Circuit's decision in *Nuclear Information & Resource Service v. Nuclear Regulatory Commission*, 457 F.3d 941 (9th Cir. 2006), is instructive. There, the court found that redressability was lacking because a different agency had promulgated "identical . . . standards" that were not part of plaintiffs' challenge, and therefore plaintiffs' requested relief would have no impact on the status quo. *Id.* at 955. In other words, where two agency actions caused the same alleged harm, reversing only one would not redress plaintiffs' injuries. Here, the converse is true. If two agency guidance documents set forth the same direction, then the rescission of only one document does not cause any injury. Because the City has not explained how the two documents are meaningfully different, it has not identified a cognizable injury. *See Oregonians for Floodplain Prot. v. U.S. Dep't of Commerce*, No. 17-CV-1179 (RJL), 2018 WL 4539680, at *4 (D.D.C. Sept. 21, 2018) (holding that property owners failed to allege concrete harm because they did not provide "examples of any specific limitations on development or indeed any changes to [the agency's] policy on development whatsoever"). In short, the City cannot carry its burden to establish injury simply by pointing to an alleged procedural violation without identifying any concrete effect. *See Spokeo*, 136 S. Ct. at 1549.

Because the City's theories of liability fail at the outset, the Court need go no further on

---

[7] The FAC notes one potential difference between the information provided in the two documents, *see* FAC ¶ 67, but the City does not argue that this difference is material, let alone explain how it contributes to its theories of injury.

United States District Court
Northern District of California

this question.  Nonetheless, the Court also concludes that the City's theories fail for largely the same reasons as the *Olmstead* Guidance.  First, although the City does cite its proprietary interest in land use regulation, *see City of Sausalito*, 386 F.3d at 1197, it does not identify any actual conflict or particular coercive effect of the FHA or DOJ's rescission, *see Sturgeon*, 768 F.3d at 1074.  Without such detail, the Court cannot find a reasonable probability that rescission threatens the City's regulatory interests.  Second, the City fails to allege that it is reasonably probable that it will be prosecuted for FHA violations because the City has no plans to violate or even arguably violate the statute.

Therefore, the Court holds that the City lacks standing to challenge the rescission of the 1999 Joint Statement.

### c.  INA Guidance (Zendejas Letter, Baudry Letter, and Refugee Employment Flyer)

The City alleges that the rescission of the Zendejas Letter, Baudry Letter, and Refugee Employment Flyer threaten its concrete interests by making "it more difficult – and therefore expensive – for the City to process more than 4,600 Employment Eligibility Verification ("I-9") forms annually."  ECF No. 38 at 15.  Because of this alleged increase in difficulty, the City contends, it is also subject to a greater risk of violations and consequently, enforcement actions. *Id.* at 15, 18-19.

As a threshold matter, the City's standing to challenge the Baudry Letter and the Refugee Employment Flyer suffers from the same defect as its challenge to the 1999 Joint Statement.  DOJ contends, and the City does not dispute, that DOJ has issued other documents that contain the same information.  *Compare* ECF No. 30-5 (Baudry Letter), *with* ECF No. 36-6 ("Guidance for Employers Conducting Internal Employment Eligibility Verification Form I-9 Audits"); and *compare* ECF No. 30-9 (Refugee Employment Flyer), *with* ECF Nos. 36-7, 36-8 ("Refugees and Asylees Have The Right to Work").  The City offers no explanation of how the challenged rescissions make it any more difficult or expensive to process I-9 forms, given these other guidance documents.  For this reason alone, the City lacks standing to challenge the Baudry Letter and the Refugee Employment Flyer for this reason.

Turning to the economic harm, the FAC nowhere alleges that the rescission of any of the three INA Guidance documents makes processing I-9 forms more expensive, let alone explains how it does so. And even if the FAC did contain the bare allegation contained in the City's opposition, it would not be sufficient. True, "[a]t the pleading stage, general factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss [a court] presume[s] that general allegations embrace those specific facts that are necessary to support the claim." *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011) (internal quotation marks omitted) (quoting *Lujan*, 504 U.S. at 561). But plaintiffs cannot merely assert that the challenged action will cause economic harm without articulating a theory of harm that is not overly speculative. *See Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 653 (9th Cir. 2017) ("At the outset, the unavoidable uncertainty of the alleged future changes in price makes the alleged injury insufficient for Article III standing."); *cf. Barnum Timber Co. v. EPA*, 633 F.3d 894, 898 (9th Cir. 2011) ("A specific, concrete, and particularized allegation of a reduction in the value of property owned by the plaintiff is sufficient to demonstrate injury-in-fact at the pleading stage."). Here, the impact of the rescinded guidance on the cost of processing I-9 forms is not obvious on the face of the pleadings and cannot be reasonably inferred without more information.

Finally, as explained above, the City does not adequately allege a reasonable probability of harm to its concrete interests based on the risk of an enforcement action. Similarly, without any information as to how the City's practices arguably violate the INA, the Court cannot assess the materiality of a general increase in federal audits and enforcement actions against employers based on the INA's citizenship provisions. *See* ECF No. 38 at 18-19.[8]

Therefore, the Court concludes that the City lacks standing to challenge the rescission of the INA Guidance.

> ### d. Fees and Fines Guidance (Dear Colleague Letter and Juvenile Fees and Fines Advisory)

Next, the City alleges that rescission of the Dear Colleague Letter and the Juvenile Fees

---

[8] The Court also notes that the City fails to address DOJ's argument that these audits are unrelated to the substance of the INA Guidance documents. ECF No. 36 at 24-25; *cf.* ECF No. 38 at 18-19.

and Fines Advisory impairs its concrete interests by (1) increasing the risk of enforcement actions and (2) causing economic harm. ECF No. 38 at 32.

First, the City alleges that the rescission eliminates a safe harbor and that "local governments face possible enforcement action even if their policies and practices comply with the rescinded guidance." FAC ¶ 93; ECF No. 38 at 18. As discussed above, the removal of a safe harbor alone is insufficient to cause injury without a satisfactory showing that enforcement action is likely. *See Cal. Sea Urchin Comm'n*, 883 F.3d at 1180. The City makes no such showing.

Second, the City alleges that it will suffer economic harm because it currently has programs that "cover court fees, traffic tickets, and similar fees and fines, on a case by case basis," and those programs will require greater resources if covered fees and fines increase. ECF No. 38 at 15 (quoting FAC ¶ 97). But the City provides no explanation as to why those penalties will necessarily increase in the absence of the rescinded guidance. Nor does the City indicate an intent to abandon its recent fee reform legislation or the "range of other fine and fee reforms" enacted by the City and the San Francisco Superior Court system. FAC ¶ 90. Though the FAC briefly alludes to state-law requirements, *id.* ¶ 91, the City does not explain which provisions of state law it is worried about violating now that the guidance has been withdrawn. In other words, the City supplies no reason why the rescission of the guidance documents would compel the City and the collaborating judicial entities to abandon their reform efforts, nor any reason that they would do so as a matter of policy discretion. Therefore, there is no basis to conclude that the challenged action will increase the burdens on the City's programs.

Alternatively, the City alleges that the rescission of the Fees and Fines Guidance will increase reliance on public benefits and public services. ECF No. 38 at 15. Specifically, the City alleges that, without those guidance documents, residents will be exposed to fees that they cannot afford, which may impair a person's credit rating or cost that person a driver's license or job. FAC ¶ 94. In turn, the City reasons, this will increase residents' reliance on the City's public benefits and public services. *Id.* As noted, above, the City does not explain how the rescission will force the City or its courts to impose such fines. Nonetheless, the City also asserts that it will suffer from the practices of the California state courts and other jurisdictions whose residents may

move into the City and seek its benefits and services.  FAC ¶¶ 94-96.

This lengthy causal chain requires the Court to consider whether it is "reasonably probable" that DOJ's rescission of the two guidance documents will threaten the City's concrete interest in avoiding additional public service burdens.  *Navajo Nation*, 876 F.3d at 1160 (citation omitted).  The crux of the City's theory is that state and other local courts will impose excessive fees and fines in the absence of the rescinded guidance documents.  As a general matter, courts are "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013); *see also Lujan*, 504 U.S. at 562 ("When . . . "a plaintiff's asserted injury arises from the government's allegedly unlawful regulation (or lack of regulation) of *someone else*, much more is needed.").  Such causal chains are inherently more speculative.

The City relies on *City of Sausalito*, where the Ninth Circuit held that Sausalito had standing to challenge the National Park Service's development plan for the neighboring Fort Baker site, which would include a conference and retreat center with 350 hotel rooms and 455 parking spaces.  386 F.3d at 1196, 1198.  The Ninth Circuit found it sufficient that the estimated additional 2,700 daily visitors would increase traffic congestion in Sausalito and demand on public services.  *Id.* at 1198-99.  The court agreed with Sausalito that it was reasonably probable that, given this increase, the challenged action would threaten Sausalito's concrete interests in municipal management, public safety, tax revenue, and the aesthetic and natural resource qualities of the municipality.  *Id.* at 1199.

*City of Sausalito* does not aid the City here.  In *City of Sausalito*, the agency's own analysis "acknowledge[d] that implementation of the Plan will result in an increase in local traffic" and other harmful impacts, *id.*, including "a detailed, fifteen-page analysis of traffic concerns . . . and the Plan's impact on parking and traffic," *id.* at 1211.  Therefore, the court reasoned, the Plan would "result in known, predictable consequences that Sausalito identifies as concrete injury."  *Id.* at 1199.  The remaining cases cited by the City involve even shorter and more certain chains of events.  *See City of Oakland v. Lynch*, 798 F.3d 1159, 1164 (9th Cir. 2015) (finding standing for municipality's collateral challenge to forfeiture action against marijuana dispensary because it was

not overly speculative that the forfeiture would be ordered and therefore deprive the municipality of tax revenue from the business); *City of Los Angeles v. Bank of Am. Corp.*, No. CV 13-9046 PA AGRX, 2014 WL 2770083, at *2, 4-5 (C.D. Cal. June 12, 2014) (finding standing for challenge to bank's mortgage practices where municipality alleged that the increased foreclosures had already reduced neighboring property values and resources would be required to remedy blight conditions at existing vacancies).

By contrast, the City's complaint and supporting materials contain no comparable information supporting its predictions as to how third parties will respond to the agency action. The FAC alleges only that "[t]hese guidance documents have formed the basis for widespread reform to stem unconstitutional practices" and "prompted numerous states to review their policies on fines and fees." FAC ¶ 87. Based solely on these alleged facts, it is not reasonable to infer that those other jurisdictions will revert to prior practices, and the Court would simply be guessing how other jurisdictions would have responded had the guidance documents not been rescinded. Even under the more generous standards applicable at the pleading stage, the Ninth Circuit has held that future predictions about the actions of third parties are too speculative to support a procedural injury where they "are supported by 'no facts, figures, or data.'" *Navajo Nation*, 876 F.3d at 1163 (quoting *Bell v. Bonneville Power Admin.*, 340 F.3d 945, 951 (9th Cir. 2003)); *cf. Desert Water Agency v. Dep't of the Interior*, 849 F.3d 1250, 1257 (9th Cir. 2017) (rejecting theory of redressability based on "the hope that such relief will cause a group of third parties who are not before the court . . . to modify their behavior in a way that [the plaintiff] thinks will redound to its benefit").

Moreover, even were the Court to accept the City's premise that other jurisdictions will impose excessive fines that they would not have assessed absent the rescission, the rest of the City's causal chain is too attenuated. In effect, the City asserts that it suffers a cognizable harm from any action that leads to a worse financial situation for persons who may eventually move to its jurisdiction and draw upon its services. The contrast with *Texas v. United States*, 809 F.3d 134 (5th Cir. 2015), is illuminating. There, the Fifth Circuit recognized the injury that Texas would suffer if an identifiable group of at least 500,000 unauthorized aliens within the state was granted

1   an immigration authorization that would render them eligible for driver's licenses, at a cost of at

2   least $130.89 per driver – equating to a total loss to the state of at least "several million dollars."

3   *Id.* at 155.  Further, the court explained, it was not speculative to think that many beneficiaries

4   would apply for licenses "because driving is a practical necessity in most of the state."  *Id.*; *see*

5   *also Pennsylvania v. Trump*, 281 F. Supp. 3d 553, 567 (E.D. Pa. 2017) (reasoning that it was not

6   speculative that the removal of contraceptive services from insurance plans would cause more

7   residents to seek the same services from state-funded programs, particularly given supporting

8   affidavits to that effect).

9       By contrast, the City's theory here is not limited to an identifiable group, and the link

10  between the challenged action and the public demand for services is both ill-defined and

11  speculative.  At bottom, the City cannot simply claim a concrete interest in the financial well-

12  being of all potential future residents.

13      The Court therefore concludes that the City lacks standing to challenge the rescission of

14  the Fees and Fines Guidance.

15                          **e.      Technical Assistance Manual**

16      Finally, the City alleges that rescission of the Technical Assistance Manual impairs its

17  concrete interest in "redress[ing] disproportionate minority contact ('DMC') at every stage of the

18  juvenile justice system."  ECF No. 38 at 19 (citing FAC ¶¶ 101-103).

19      The Court first notes that, although the City frames this injury as a frustration of its

20  mission under the organizational standing framework, ECF No. 38 at 19, 32, it identifies no

21  corresponding diversion of resources or economic harm that will result, *cf. id.* at 15-16, 19; *see*

22  *also City of Redondo Beach*, 657 F.3d at 943.  Nevertheless, the Court assumes for the sake of

23  argument that the City has a proprietary interest in redressing DMC within its own juvenile justice

24  system that does not require that additional component of injury.

25      The FAC states unequivocally that the City "intends to continue its efforts [in this area]

26  unabated, despite the repeal of this document."  FAC ¶ 103.  But the FAC notes that 30 percent of

27  the juveniles that interact with the City's Juvenile Probation Department "experience their first

28  juvenile justice contact in another county, before ultimately winding up in San Francisco's

1   juvenile justice system." *Id.* Accordingly, the FAC reasons, the City's interest in addressing these

2   racial disparities could be harmed by "other jurisdictions abandoning or scaling back their efforts

3   to implement the practices set forth in the Technical Assistance Manual." *Id.*

4           As with the Fees and Fines Guidance, the City identifies no basis on which to predict how

5   other jurisdictions will react in the absence of the rescinded guidance. In fact, the only data point

6   the FAC provides is that the City's own efforts will continue "unabated." *Id.* ¶ 103. The City

7   therefore alleges no facts from which the Court could infer that it is reasonably probable that other

8   jurisdictions will act in ways that impair the City's asserted concrete interest. *See Navajo Nation*,

9   876 F.3d at 1163.

10          Accordingly, the Court holds that the City lacks standing to challenge the rescission of the

11  Technical Assistance Manual.

12                                          **CONCLUSION**

13          In sum, the City lacks Article III standing to challenge any of the disputed rescissions. The

14  Court therefore does not reach DOJ's remaining arguments.

15          For the foregoing reasons, the Court grants DOJ's motion and dismisses the City's

16  complaint. The Court concludes that amendment would not necessarily be futile, *see Lacey v.*

17  *Maricopa County*, 693 F.3d 896, 926 (9th Cir. 2012), and grants leave to amend. The City may

18  file an amended complaint within 30 days.

19          **IT IS SO ORDERED.**

20  Dated: December 10, 2018



                                            _____
21                                          JON S. TIGAR
22                                          United States District Judge

23

24

25

26

27

28